Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MITCHELL CARLTON SIMS,
              *Petitioner-Appellant,*

v.

JILL BROWN, Warden,*
              *Respondent-Appellee.*

No. 03-99007

D.C. No.
CV-95-05267-GHK

OPINION

Appeal from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted
June 9, 2005—Pasadena, California

Filed September 21, 2005

Before: Betty B. Fletcher, Pamela Ann Rymer, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Rymer;
Partial Concurrence and Partial Dissent by Judge B. Fletcher

---

*Jill Brown is substituted for her predecessor, Jeanne Woodford, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Trevor W. Morrison and John H. Blume, Cornell Law School, Ithaca, New York, for the petitioner-appellant.

David F. Glassman, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

**OPINION**

RYMER, Circuit Judge:

In 1987, Mitchell Carlton Sims was convicted of the first degree murder of John Harrigan, a Domino's Pizza employee who delivered a pizza to Sims and his girlfriend, Ruby Padgett, at their motel room in Glendale, and the attempted murders of two other Domino's employees, Kory Spiroff and Edward Sicam. He was sentenced to death. The California Supreme Court affirmed. *People v. Sims*, 5 Cal.4th 405 (1993), *cert. denied*, *Sims v. California*, 512 U.S. 1253 (1994). After the supreme court denied Sims's petition for a writ of habeas corpus, Sims filed a 28 U.S.C. § 2254 petition in the United States District Court for the Central District of California on April 22, 1996. Following an evidentiary hearing, the district court denied all of Sims's claims on May 2, 2003.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) does not apply to the merits of Sims's appeal because his federal petition was filed before AEDPA's effective date, *Lindh v. Murphy*, 521 U.S. 320, 327 (1997), but it does apply to the procedures for seeking review. Accordingly, Sims obtained a Certificate of Appealability (COA) on seven issues: (1) whether his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated by the admission of confessions obtained in a custodial setting after he invoked his rights to counsel and silence; (2) whether the prosecutor's peremptory challenges to two Hispanic prospective jurors violated *Batson v. Kentucky*, 476 U.S. 79 (1986); (3) whether his right to an impartial jury was violated when a member of his jury met with a member of Padgett's jury and discussed writing a book about their experiences; (4) whether his Eighth and Fourteenth Amendment rights were violated by the prosecutor's closing argument in the penalty phase about factor (k), the last factor in mitigation under California law that covers "any other circumstance which extenuates the gravity of the

crime"; (5) whether trial counsel rendered ineffective assistance during the penalty phase by failing to investigate, develop, and present mitigating evidence about Sims's mental condition; (6) whether counsel was ineffective in failing to object to comments that Sims argues violated *Griffin v. California*, 380 U.S. 609 (1965); and (7) whether reversal is required on account of cumulative error.

We affirm.

## I

## A

Sims had managed a Domino's Pizza parlor in West Columbia, South Carolina before resigning when he got angry at his boss for withholding part of a bonus.[1] Sims sought revenge, and told his then-girlfriend that he wanted to use explosives to kill the boss. He bought a gun. On November 15, 1985, Sims was hired as a delivery driver by another Domino's, in Hanahan, South Carolina.

On December 8, 1985, Sims and Padgett ended up in Glendale, California. They went to a Domino's and asked Kory Spiroff, the assistant manager, for directions to a drugstore. On the afternoon of the next day, a man and woman went to a Sears store in Glendale and bought a package of socks, underwear, a clothesline, and a knife. The sales clerk overheard the woman tell the man to relax because they would be leaving the store shortly.

On the evening of December 9, Spiroff was on duty with delivery drivers Edward Sicam and John Harrigan. Each had on a Domino's uniform, consisting of short-sleeved shirts

---

[1] Our recitation of the facts is primarily based on the California Supreme Court's summary, *Sims*, 5 Cal. 4th at 418-27, which is presumed to be correct. *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir. 2001).

with a Domino's badge and name tag. At 11:03 p.m., Brian Scarlett, an off-duty Domino's employee who was visiting Spiroff, took a telephone order from a man with a southern accent. The caller asked for the pizza to be delivered to Room 205 of the Regalodge Motel. The motel was a three-minute drive from the parlor. Harrigan, who was twenty-one years old, left the parlor at 11:26 p.m. in his Toyota truck to make the delivery.

Around 11:45 p.m., Sims and Padgett went into the Domino's. Spiroff recognized the couple from the day before. This time, Sims pointed a gun at Sicam and ordered Spiroff and Sicam into a back office. When Spiroff warned Sims that a delivery driver was due back at any moment, Sims took off his sweater to reveal a Domino's shirt with Harrigan's name tag and chuckled, "No, I don't think so."

Sims found a bank deposit bag which he gave to Padgett, who then emptied the parlor's cash drawers. Sims told her to watch for fingerprints, and she began wiping the tables and cash drawers at his direction. Sims ordered Spiroff and Sicam to stand in the corner of the office and aimed his gun directly at them.

At this point, Richard Wagner, an off-duty Domino's employee, arrived at the parlor with his wife. Sims told Spiroff to go to the front counter, threatening to shoot Sicam unless Spiroff cooperated. Instead of acknowledging Wagner as a friend, Spiroff asked him for his order. Meanwhile, Sims took an order over the phone, identifying himself as "Mitch" to the customer. While Spiroff prepared the pizzas, Sims told the Wagners to wait in the car for their pizza to be brought to them. After Sims gave the Wagners their pizza, they drove off and, suspecting a burglary, called the police.

Sims decided to take Spiroff and Sicam, one at a time, into the walk-in cooler. The cooler was 8 feet by 12 feet, with a 3-tier rack against the left wall. The temperature was kept at

32 to 40 degrees. Sims tied Spiroff's hands tightly behind his back with one end of a rope, looped the other end over the rack, and lifted Spiroff's arms painfully high by pulling down on the rope. This forced Spiroff to stand on his tiptoes to ease the tension in the rope and alleviate the pain. When Spiroff complained, Sims replied, "Shut up. At least you live." Next, Sims wrapped the end of the rope around Spiroff's neck and tied it so tightly with a knot in back of the neck that Spiroff would strangle if he stopped standing on his tiptoes. Sims asked Spiroff when the cooler would be opened the following day. Spiroff said at 11 a.m. Sims replied that, by then, he and Padgett would be in San Francisco. When Spiroff asked Sims about Harrigan, Sims said that Harrigan had been tied up at the motel and would be found after Spiroff was found.

Sims then brought Sicam into the cooler and bound him in the same manner as Spiroff. When Sicam said he was choking, Sims responded, "You are alive." Sims closed the cooler and left at 12:15 a.m. with Padgett.

While standing on the toes of one foot, Spiroff tried to knock over cartons so they could stand on them and relieve some of the pressure around the neck, but the rope tightened as he moved. Eventually he succeeded in knocking a box over. Nevertheless, at some point Spiroff blacked out.

Responding to Wagner's call, Glendale police officers arrived at 12:30 a.m. They found Spiroff and Sicam in the cooler. One of them told the officers that their assailant was wearing Harrigan's shirt and that Harrigan had not returned from delivering a pizza to the Regalodge.

The officers went to the Regalodge, got the key and registration card to room 205, which was registered to Sims, and found Harrigan's dead body in the bathtub. The bathtub was full of water, and Harrigan's body was submerged under the water on his right side with his back parallel to the side of the tub. Cold water was running at full blast onto the back of Har-

rigan's neck. His head was immediately under the spout, about one inch below the water line. The drain plug was broken, but the tub was filled with water up to the overflow valve. Harrigan's wrists were bound behind his back; his ankles were bound; and his feet and hands were "hogtied" together behind his back. His head was covered with a pillow case, which was secured with a rope ligature around the neck. A washcloth had been placed inside his mouth, held in place by a sock tied around his head.

Dr. Joseph Cogan, the state's forensic pathologist, who performed the autopsy on Harrigan's body, determined that the cause of death was ligature strangulation based on the depth of the furrow around the decedent's neck, indicating the extreme pressure of the ligature around the neck, and hemorrhages on the inner eyelids, indicating that Harrigan was alive when the neck ligature was applied because it obstructed blood flow to the head and brain. Cogan opined that Harrigan lived for no more than ten minutes after the neck ligature was applied and that the ligature in itself was enough to kill Harrigan. However, Cogan could not rule out the possibility that drowning contributed to Harrigan's death, based upon Harrigan's having been found fully submerged in a bathtub of water with a gag in his mouth, and the presence of frothy pulmonary edema in his trachea and bronchi.

No money, wallet, or car keys belonging to Harrigan were found in the room. The phone lines had been cut. Although the room had been wiped clean with a wet towel, Sims's fingerprints were found inside a toilet paper roll and in a telephone book on the page listing "pizza." The knots used to tie up the ligatures on Harrigan's neck were identical to those used to tie up Spiroff and Sicam. The rope used to bind Harrigan, Spiroff, and Sicam was similar to the clothes line sold to the young couple at the Glendale Sears the day before Harrigan's murder.

Sims and Padgett were apprehended in a Las Vegas motel on December 25 by the Las Vegas police acting on an anony-

mous tip. A fully loaded .25 caliber pistol was found under the mattress. The police also recovered a Los Angeles Times article entitled, "Delivery Man Slain While Making Run," and a yellow page torn from a Las Vegas telephone book listing Domino's Pizza establishments. Harrigan's pickup truck, with a Domino's shirt bearing Harrigan's name tag inside, was also found in Las Vegas about twenty miles from the motel.

Sims was taken to the Clark County jail. Officers Jonathan Perkins and Gary Montecuollo of the Glendale Police Department met with him in an interview room. Informed of his rights pursuant to *Miranda*, Sims acknowledged his understanding and signed a written form indicating that he did not waive his rights. As Perkins gathered his papers and stood up to leave, Sims asked what was going to happen to him from that point on, and indicated that he would like to go to South Carolina rather than California. During the conversation that followed, Sims told Perkins, "I had to kill that boy" and "He would have identified me." At the end of the interview, Perkins told Sims that Sims would have to initiate any further conversation about the investigation, which Sims did the next day. Perkins tape recorded this interview, which included Sims's statement "I just got drunk, and I didn't know what the fuck I was . . . I knew I was doing it, but I shouldn't have done it." After Perkins readvised Sims of his *Miranda* rights, Sims said that he had worked for Domino's Pizza in South Carolina and that he and Padgett had traveled by bus from that state to Glendale where they rented room 205 at the Regalodge. He told Perkins they had gone to Domino's for directions to a drugstore, and to Sears to buy a knife. He said that the next day they returned to Domino's for a pizza. At that point Sims ended the interview.

Sims's December 25 statements and an edited version of the tape of the December 26 interview were admitted in the guilt phase.

Sims did not testify. His forensic pathologist, Dr. Robert Bucklin, testified that the white, frothy material in Harrigan's

larynx and trachea indicated that he had drowned, and that the furrow and hemorrhages could have resulted from the posture of Harrigan's head rather than asphyxia. Bucklin also testified that strangulation might have contributed to Harrigan's death. Stephen Schliebe, a private criminalist, testified that a piece of rope tied as the ligature was to Harrigan's neck would not cause loss of consciousness. Sims's theory of defense was that Harrigan was alive when Sims put him in the bathtub and left with Padgett, and that he lacked the intent to kill Harrigan, Spiroff, or Sicam.

The jury found Sims guilty of one count of first degree murder, with two special circumstances findings (that Sims committed the murder while lying in wait and during the commission of a robbery), two counts of attempted murder, and three counts of robbery. The jury also found that Sims used a firearm during the commission of each offense.

B

At the penalty phase the prosecution introduced evidence that Sims robbed and shot to death two Domino's Pizza employees in Hanahan, South Carolina less than one week before the Glendale crimes. Just after 2 a.m. on December 4, approximately two weeks after Sims was hired as a delivery driver at the Hanahan Domino's, Gary Melkie, the assistant manager, appeared in the lobby of the Police Department about three blocks away, dressed in his uniform with a telephone cord dangling from one of his wrists and bleeding profusely from gunshot wounds to his head and neck. A paramedic responded and Melkie was placed in an ambulance. En route to the hospital, the ambulance detoured to the parlor where another shooting had been reported. There, the police had found Chris Zerr, a delivery driver, lying on the floor covered with blood, his hands tied behind his back with a telephone cord. He died shortly thereafter from a gunshot wound to the head. $1,164 had been taken from the cash drawers.

At the hospital, the paramedic asked Melkie who had shot him and Melkie responded, "Sims. Mitch Sims." Melkie said that Sims had tied him up and then shot Zerr. Melkie repeated the same thing to a police officer, including a description of Sims, and said that Sims worked for Domino's. Melkie died after surgery.[2]

Melkie had suffered four gunshot wounds to the head and neck, a bullet casing was removed from his tongue, and a fifth bullet, which had exited from his head, was recovered from a wall at the parlor.

An unedited version of the tape recording of Sims's December 26 statement to Perkins was admitted into evidence and played for the jury. In that portion of the statement, Sims recounted that he had robbed a Domino's Pizza parlor in South Carolina before going to California.

The defense presented as mitigating evidence a number of witnesses who testified about Sims's brutal family background of physical, sexual, and emotional abuse. His mother, Mildred, testified that Sims only saw his natural father (from whom she was divorced) on two or three occasions during his childhood, and that she married Arnold Cranford in 1961. She had three children with her first husband and two with Cranford. Cranford had a drinking problem and became violent and sexually abusive when intoxicated. She testified that Cranford raped Sims when he was seven years old, and forced Sims to engage in oral sex with him over the years. When Sims was sixteen, Cranford made him have sexual intercourse with his mother. They both cried during the incident. On another occasion, Cranford forced Sims to have intercourse

---

[2]Following the trial in this case, Sims was tried and convicted in South Carolina of the murders of Melkie and Zerr during the commission of a robbery, and the death penalty was imposed. The convictions and sentence of death were affirmed by the Supreme Court of South Carolina. *State v. Sims*, 304 S.C. 409, (1991), *cert. denied*, 502 U.S. 1103 (1992).

with his older sister Merlon. Cranford repeatedly told Sims that Sims was "no good" and a bad person. Sims began drinking heavily at fourteen, and attempted suicide by drowning when he was an adolescent.

Merlon testified to repeated incidents of physical and sexual abuse that she and the other children suffered at the hands of Cranford. She said that every night was a nightmare, and that "[i]t ain't never going to leave me alone." Cranford would drag her out of bed, force her to strip, and then beat her, tie her to a bed, fondle her, and occasionally have sexual intercourse with her. Cranford brought men home and forced her to have sex with them. She also attempted suicide several times. Cranford threatened to kill the children if they told anyone about what he did. When Sims was sixteen, Cranford forced Sims's younger stepsister, Margaret, to undress and lie beside him in bed. He began to fondle her and told her he was going to have sex with her, but Sims called the police. Cranford was arrested and convicted.

Sims's brother Eddie also testified. He watched as Cranford forced Sims to have sex with Cranford on many occasions. He heard Cranford having sex with Margaret in the next room. Eddie also tried to commit suicide, and he said that Sims tried to lift up his spirits. Sims's other siblings did not testify, but there was evidence that Margaret ran away from home and began taking drugs, and that his brother Jimmy was a career army officer.

Sims's wife, Theresa, had known Sims since she was nine, and she, too, had experienced an abusive childhood. They were married when Sims was twenty and she was sixteen. They had three children, who worship Sims and live for his phone calls and letters. She testified about various jobs that Sims had held, and said that he became withdrawn and depressed whenever he was promoted at work, that he engaged in extensive substance abuse, and that he suffered a sense of worthlessness and guilt from the incestuous act he

committed with his mother. While he was working at Domino's, Sims had an affair with a co-worker but came back to Theresa. He left Theresa again when he met Padgett. Sims told Theresa he was no good for her and did not want to pull her, and the boys, down with him. At her urging, he saw a counselor and cried as he recounted the abuse he had suffered. Sims's mother, sister and stepbrother, as well as his wife, testified that Sims was sensitive and continued to be a good, supportive father to his three children.

Dr. William Vicary, a psychiatrist, testified that Sims suffered from chronic depression, and alcohol and drug abuse. He stated that Sims had long-standing feelings of inadequacy, low self-esteem, despair, shame, and humiliation. Vicary explained that individuals who have suffered a lot of verbal and physical abuse tend to be crippled from a psychological point of view and have trouble later in life, becoming violent, abusive adults. On cross-examination Vicary admitted that Sims had never been diagnosed as mentally ill, and that his depression was not severe.

At the conclusion of the penalty phase, the jury fixed the punishment at death.

### C

Sims appealed to the California Supreme Court, which upheld both the conviction and sentence. *Sims*, 5 Cal.4th at 467. With respect to the issues that are now before us, it concluded that the prosecutor based his juror challenges on his perception of an individual bias, not on the basis of group bias; that admission of Sims's confessional statements on December 25 and 26 was harmless error under *Chapman v. California*, 386 U.S. 18 (1967), given overwhelming evidence of Sims's intent to kill Harrigan independent of those statements;[3] and that there was no reasonable possibility the jury

---

[3]Justice Mosk dissented from the *Chapman* analysis; Justice Kennard wrote in her concurring and dissenting opinion that she would have held that Sims initiated conversation on both days and waived his right to counsel.

was misled to believe it could not consider Sims's background in mitigation. The United States Supreme Court denied Sims's petition for writ of certiorari. *Sims v. California*, 512 U.S. 1253 (1994). Sims filed a state habeas petition in February 1993, which was summarily denied on March 2, 1994.

Sims initiated federal proceedings by filing a request for stay of execution and appointment of counsel on August 8, 1995. His petition for habeas relief was filed on April 22, 1996. The district court found some claims unexhausted and granted Sims leave to amend his petition to delete those claims. Sims filed a second petition in state court on October 10, 1997, which the California Supreme Court denied on April 29, 1998. After he amended his federal petition, Sims asked for an evidentiary hearing and was given a hearing on one of the claims that is pursued on appeal — ineffective assistance of counsel regarding mental health evidence. On this claim the district court found that Sims failed to establish that his attorney's performance was deficient because counsel consulted qualified experts who did not suggest the need for additional information or experts after being informed of the relevant information about Sims's background and relationships. On other claims raised on appeal, the court held in an exhaustive order that Sims's claim of juror misconduct was not supported by any indication that there were improper communications between the Sims juror and the Padgett juror. With respect to Sims's admissions, the district court agreed with the trial court (rather than with the California Supreme Court) that the statement "I had to kill that boy" was not made in response to interrogation; it held that Sims's statement "The boy would have identified me" was the product of remarks by Perkins that the officer should have known were reasonably likely to elicit an incriminating response; and it concluded that Sims's December 26 statement that "I just got drunk, and I didn't know what the fuck I was . . . I knew what I was doing, but I shouldn't have done it" was a response to express questioning about the crime itself by Perkins that

should not have been admitted, but that his post-*Miranda* statements were properly admitted. Regardless, applying *Brecht* harmless error analysis,[4] the district court embraced the California Supreme Court's finding (applying the stricter *Chapman* standard) that even if a portion of Sims's statements were admitted erroneously, any error was harmless. The court rejected Sims's challenge to the prosecutor's argument about mitigating evidence because, in its opinion, the prosecutor never told the jury to disregard Sims's history of abuse but instead argued that it lacked weight and, even if the argument were improper, any error was cured by the trial court's instructions. With respect to Sims's *Batson* claim, the district court held that Sims failed to show purposeful discrimination given the prosecutor's explanation that his challenges were based on the jurors' lack of life experience and responsibility. Finally, the court saw no ineffectiveness in counsel's failure to object to the prosecutor's comment on Sims's failure to testify as the prosecutor's comments were not improper.

Sims has timely appealed the denial of his habeas petition.[5]

## II

Sims argues that the incriminating statements he made to

---

[4]*Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding that a federal court may only grant habeas relief from a state court judgment if constitutional error "had substantial and injurious effect or influence in determining the jury's verdict" (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))).

[5]We review *de novo* a district court's denial of a habeas petition filed under 28 U.S.C. § 2254. *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003). A district court's factual findings are reviewed for clear error. *Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). In pre-AEDPA cases such as this, we review legal questions and mixed questions of law and fact *de novo*. *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001) (en banc). State court findings of fact are presumed correct to the extent they are "fairly supported by the record." 28 U.S.C. § 2254(d) (1994); *Mayfield*, 270 F.3d at 922.

police officers on December 25 and 26 while he was in their custody and after he had invoked his right to counsel were obtained, and introduced, in violation of his Fifth and Fourteenth Amendment rights under *Miranda* and its progeny.[6]

After Sims had declined to waive his rights on the 25th, and Perkins had started to leave, Sims asked what was going to happen to him from that point on, and said that he would rather go to South Carolina than California. Perkins replied that he planned to obtain Sims's extradition to California, that there were warrants for Sims's arrest in connection with the murder of two Domino's employees in South Carolina as well as for the murder in Glendale, that he was investigating the Glendale murder, and that the body of a Domino's delivery driver was discovered in room 205 of the Regalodge where he had reason to believe that Sims and a young woman were staying. Sims interjected, "I had to kill that boy." Perkins

---

[6]*See, e.g.*, *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (holding that interrogation under *Miranda* refers to words or actions by the police that they "should know are reasonably likely to elicit an incriminating response"); *Edwards v. Arizona*, 451 U.S. 477, 485 (1981) (holding that once an accused asserts his right to the presence of counsel he must himself "initiate[ ] further communication, exchanges, or conversations with the police" before further interrogation may take place); *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (plurality opinion) (holding that once an accused asserts the right to counsel, re-initiation occurs when he "evince[s] a willingness and a desire for a generalized discussion about the investigation"); *see also Shedelbower v. Estelle*, 885 F.2d 570, 573 (9th Cir. 1989) (holding that an officer's false statement that the suspect had been identified by a rape victim was not the type of comment that would encourage the accused to make some incriminating spontaneous remark); *United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) (holding that agent's statements that the government had seized cocaine, the accused was in serious trouble, and he faced a lengthy prison sentence were not the functional equivalent of interrogation because they did not invite a response); *United States v. Orso*, 266 F.3d 1030, 1033-34 (9th Cir. 2001) (en banc) (holding that officer should have known it was reasonably likely that engaging in discussion about evidence and witnesses against the accused as well as the penalties for the crime would cause the suspect to respond).

responded, "What did you say?" and Sims repeated, "I had to kill that boy." Perkins then described how Harrigan's body was found, and commented that Harrigan "did not have to die in this manner and could have been left there tied and gagged in the manner in which he was found." Sims stated "The boy would have identified me." As he was leaving, Perkins told Sims that he would have to initiate further conversation about the investigation. The next day Sims asked to see the Glendale officers.

Perkins took a tape recorder with him on the 26th. Sims complained about being in the "hole" because jail authorities thought he was going to kill himself. Perkins asked whether he was going to and Sims said "Why should I?" Perkins said, "O.K., that's all I want to hear . . . You don't seem like that kind of guy." Sims responded: "I'm not, I'm not a murderer either but, . . . ." Perkins said: "What does that mean?" And Sims answered: "That means that I just got drunk, and I didn't know what the fuck I was, I knew I was doing it, but I shouldn't of done it." Perkins told Sims he had trouble discussing the case because Sims had not waived his *Miranda* rights. Sims expressed interest in returning to South Carolina where his family was, and remaining in the same state as Padgett. Perkins explained that Sims would likely be tried first in California, then be released to South Carolina, when Sims said: "You know they won't even let me see a lawyer, they have charges against me in Nevada, huh . . . , lawyer." Perkins said: "You're a fugitive, yeah. Well tomorrow, you go to court." Sims asked: "Why don't they charge me with possession of pot or something? (Laughs.) I had a bag."

Later, Perkins readvised Sims of his *Miranda* rights, and Sims waived them to discuss Padgett's lack of involvement in the South Carolina crimes. Sims said that he had worked at a Domino's Pizza in Columbia for thirteen months before moving to Charleston. He admitted robbing a Domino's in a Charleston suburb, but told the officers that Padgett was unaware of the robbery until after it happened. The next

morning they left for Jacksonville, Florida, and from there went to Los Angeles. Sims said he and Padgett rented room 205 at the Glendale Regalodge on December 8. He told Perkins they had gone to Domino's for directions to a drugstore, and to Sears to buy a knife. He said that the next day they returned to Domino's for a pizza. At that point Sims ended the interview.

## A

Sims contends that the California Supreme Court correctly held that he unambiguously invoked his right to counsel on December 25; that for this reason all interrogation had to stop; and that he did not re-initiate discussion about the Glendale murder either by asking about extradition on the 25th, because that question concerned the routine incidents of the custodial relationship instead of the criminal investigation, or by contacting the Glendale officers on the 26th. The state counters that the trial court and the district court correctly determined that Sims's initial incriminating statement "I had to kill that boy" was spontaneous and not in response to interrogation, and that the trial court's findings with respect to the remaining comments were correct. This is a debate that we need not engage, however, because we agree with both the California Supreme Court and the district court that admitting Sims's incriminating remarks was harmless.[7]

We "review the evidence at trial to determine whether the confession likely had a substantial and injurious impact on the verdict; if not, its admission was harmless." *Taylor v. Maddox*, 366 F.3d 992, 1016 (9th Cir. 2004) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-39 (1993)). "If a habeas court is left with 'grave doubt' about whether a constitutional error substantially influenced the verdict, then the error was not harmless." *Parle v. Runnels*, 387 F.3d 1030, 1044 (9th

---

[7]*See, e.g.*, *Spicer v. Gregoire*, 194 F.3d 1006, 1008 (9th Cir. 1999) (assuming constitutional error and finding it harmless).

Cir. 2004) (citing *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995)).

Sims suggests that both courts conducted their harmless error analysis — the California Supreme Court under *Chapman*, and the district court under *Brecht* — improperly by assessing the strength of the state's evidence apart from the erroneously admitted statements. We do not think so, because courts do review all the state's evidence to determine whether error had a substantial and injurious effect on the jury's verdict. *See, e.g.*, *Brecht*, 507 U.S. at 639 (finding harmless error in part because "the State's evidence of guilt was, if not overwhelming, certainly weighty"); *Parle*, 387 F.3d at 1044 (concluding that error was harmless where "the prosecution had overwhelming evidence" of intent); *see also Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (noting, under the *Chapman* standard, that "[w]hen reviewing the erroneous admission of an involuntary confession, the appellate court . . . simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt"). In any event, as we explain, the evidence of Sims's guilt was overwhelming and there is no reasonable likelihood that the challenged statements actually prejudiced him.

**[1]** At trial on the guilt phase, Sims's only argument was that he did not intend to kill Harrigan, and thus the prosecution could not establish either first degree murder or the special circumstance of lying in wait. His theory was that Harrigan could have drowned himself, after Sims left, by turning onto his side and thereby submerging his head under water. However, as the California Supreme Court found, Harrigan "had been hog-tied and gagged, with a pillowcase pulled over his head and secured by a ligature bound so tightly that the victim inevitably would die of strangulation if death did not occur first by drowning — the victim having been left in the bathtub with the water running over his head." *Sims*, 5 Cal. 4th at 448. In light of the record as a whole, it is clear

that Sims's incriminating statements did not have a substantial and injurious effect on the verdict.

Sims had it in for Domino's, wanted revenge, and had expressed the desire to blow up a Domino's pizza parlor with employees inside it. As a former Domino's manager Sims knew how Domino's operated. He had scouted out the Glendale Domino's the day before, so he knew how long it would take the delivery driver to get to the motel and for Padgett and him to get from the motel to the parlor. Sims lured the delivery driver to Room 205 by calling to order a pizza at 11:03 p.m. Sometime after that he cut the phone cord. Harrigan left the parlor at 11:26 to deliver Sims's pizza. Within less than twenty minutes, Harrigan had made the delivery, and Sims had stuffed a washcloth in Harrigan's mouth and tied it with a sock around his head; put a pillow case over Harrigan's head, and tied it with a rope knotted in back of the neck tightly enough to strangle him; taken off Harrigan's Domino's shirt; tied Harrigan's wrists together and tied his feet together, then hog-tied his hands and feet behind his back; stolen Harrigan's keys and money; put Harrigan into the bathtub with cold water running at full blast, which was unnecessary if Sims's only aim were to incapacitate; *and* gone with Padgett to the parlor, arriving there (wearing Harrigan's shirt underneath a sweater) before the delivery driver's absence would be noticed. Room 205 was meticulously wiped clean of fingerprints, also a largely unnecessary precaution if Harrigan were meant to survive because he would be able to identify both of them.

Once at the parlor, Sims responded to Spiroff's warning that Harrigan would be returning from a delivery by chuckling, "No, I don't think so," and removing his sweater to reveal a Domino's shirt with Harrigan's name tag. Sims then proceeded to order Spiroff and Sicam into the corner of the office where he pointed his gun directly at them before being interrupted by Wagner's arrival, and after taking care of Wagner's order, bound the two employees in the cooler in such a

way that they, too, would almost certainly die before the cooler was opened the following day. When Spiroff and Sicam complained, Sims responded "Shut up. At least you live."

Although the prosecutor did rely on Sims's statements in closing argument, the emphasis was on the "extremely life-endangering" way that Sims's victims were bound, his calculated and expeditious execution of the crimes, his threats to blow up the South Carolina Domino's, his meticulous wiping down of the motel room, and his apparent intention to kill Spiroff and Sicam. The prosecutor's main point was that Sims guaranteed Harrigan would die in one of two ways: either he would be strangled to death by the ligature around his neck, or he would drown to death in the bathtub.

[2] In sum, there was strong evidence of motive to kill, other circumstantial evidence that reflected careful planning to make sure Harrigan would not be missed or return, and evidence that pointed to death as the only possible outcome of putting a hog-tied person with a ligature around his neck in a bathtub with the water running. Accordingly, we conclude that although confessions are undoubtedly powerful evidence, *Fulminante*, 499 U.S. at 296, apart from Sims's statements, the evidence overwhelmingly showed that he meant for Harrigan to die, one way or the other.

B

Sims also argues that the prosecutor's reliance on his statements at the penalty phase had a substantial and injurious effect in determining his sentence. First, he asserts that the prosecutor used Sims's statements to argue that Harrigan's killing was "vicious, sadistic, cruel, and needless." In addition, he contends that the prosecutor's reliance on the South Carolina crimes, which Sims partially described in his December 26 statements, to establish his planning, intent to

kill, and lack of remorse "surely affected" the jury's sentencing deliberations.[8]

To show that Sims deserved the death penalty, the prosecution predominantly relied on the depraved way in which Sims perpetrated his series of killings and attempted killings. Sims began in South Carolina, where he killed his coworkers, Zerr and Melkie. After Zerr was rendered helpless with his hands tied behind his back, Sims shot him to death at point blank range in the head. He proceeded to shoot Melkie, also bound, in the head, through the mouth (knocking out several teeth), in the back of the head, and through the neck, as Melkie moved around the room. After traveling to Glendale, Sims lured Harrigan, an innocent pizza delivery man, to his motel room, hogtied and gagged him, and, despite his incapacitation, then placed him in a bathtub with the water running full force. Having just killed three people in the last few days, Sims then drove to Domino's in Harrigan's uniform, chuckled as he told Spiroff and Sicam that Harrigan would not be returning, pointed a gun at Spiroff and Sicam in the corner of the office before Wagner's entrance, and laughed and joked with people in the store as he took pizza orders at the front counter. Before leaving, he hanged Spiroff and Sicam in the cooler in a manner that promised a slow, agonizing, and painful death. When he was arrested a couple of weeks later in a Las Vegas motel room, the police found a yellow page torn from a Las Vegas telephone book listing Domino's Pizza establishments.

During the prosecutor's discussion of the manner of Harrigan's death in his closing argument, he suggested that Harri-

---

[8]Whether the verdict was "surely affected" is not the standard by which we measure harmless error. Sims apparently drew the concept from *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993), which discussed the distinction between structural error and *Chapman* harmless error review of trial errors — noting in that connection that the verdict must be "surely unattributable" to error. However, *Chapman* does not apply to federal habeas review.

gan had raised his head above the waterline in the bathtub to avoid drowning, leaving Sims to push his head back under the water. The prosecutor then made a passing reference to Sims's statement, "I had to kill that boy." He continued, "What more could Mitchell Sims do to John Harrigan other than to take this helpless individual who was hogtied, bound, gagged, and strangled and hold his head under water until he stopped moving. It is as vicious, it is as sadistic, it is as cruel, it is as needless, absolutely needless a death as you can think." Thus, the reference to Sims's statement added nothing to the prosecutor's point — that the circumstances of Harrigan's death were especially heinous.

Sims also notes that the prosecutor relied on Sims's South Carolina crimes, which Sims partially described in his December 26 statement. However, Sims's statement could not have had any prejudicial effect because the entire story of how Sims shot and killed Melkie and Kerr was independently presented to the jury in the penalty phase.

### III

During jury selection, the prosecutor used eight of his first twelve peremptory challenges to strike four African-American and four Hispanic venire panelists. These strikes left no black and one Hispanic-surnamed individual in the box. Sims argues that this statistical disparity, combined with other evidence, shows that two of the strikes — against Rolando Mandujano and Maria Cerda — were exercised on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

Defense counsel raised a *Wheeler* objection after the prosecutor had challenged four prospective jurors who were black.[9]

---

[9]*People v. Wheeler*, 22 Cal.3d 258 (1978), is the California analogue of *Batson*, although it has somewhat different standards. Our review, of course, is for federal constitutional error under *Batson*. The United States

The prosecutor offered individualized justifications for each strike, primarily having to do with the jurors' views of the death penalty and reasonable doubt. One juror, Torey Gaines, the prosecutor believed was "too young" and he wanted people who were accustomed to exercising responsibility. The prosecutor also said: "There are several black jurors, I think, that are outstanding in this case that just haven't been called. There are no Blacks. The only Black person in this case is the people's expert witness. We have a southern white defendant and we have white victims. Why would I not want Blacks on the jury? As a matter of fact, I do want Blacks on the jury." When counsel objected to peremptory challenges of Sonia Vasconcellos, Alfredo Estevez, Mandujano and Cerda, the prosecutor also volunteered an explanation for his strikes. Vasconcellos had a language problem and the prosecutor had problems communicating with her; Estevez was very hostile to the death penalty; Mandujano was a "sharp guy" but was "a college student" who did not have the "life experiences" nor did he "exercise the kinds of responsibility needed in a case like this"; and Cerda was "[v]ery young" and did not "have the type of life experiences or responsibility to take on a case like this." The prosecutor remarked that "[t]here are many Latins in the audience who I hope are called as jurors in this case. The defendant in this case is white. All the witnesses are white. There is one exception, a black expert that the people called, and there is a — at least one Latino that the people are going to call." He added that he applied neutral criteria, likes minority jurors, and preferred "on a case like this to have minority jurors. I just haven't gotten lucky yet."

The trial judge found "some reason for the prosecution's actions" with respect to six of those struck, including Mandu-

Supreme Court recently rejected the standard that California required under *Wheeler* for a prima facie showing. *Johnson v. California*, 125 S. Ct. 2410 (2005). However, *Johnson* does not affect our analysis because Sims's appeal does not turn on the prima facie case.

jano, who "appeared quite young to the court," but made no specific finding on Cerda. He denied the *Wheeler* motion, finding that "[t]here is no evidence other than the fact that all four Black jurors have been peremptorily excused to support a finding at this time by the court of a systematic exclusion of Blacks or Hispanics."

The California Supreme Court found that "the prosecutor's stated justifications were facially race-neutral, based upon a perception of a 'specific' or individual bias of each juror rather than a group bias, and thus afforded a constitutionally permissible basis for the exercise of the peremptory challenges in question." *Sims*, 5 Cal. 4th at 430. It also found that the voir dire of Cerda supported the prosecutor's justifications as she "gave tentative, uncertain, and equivocal responses to nearly every question that was asked relating to the death penalty." *Id.* at 431. Finally, addressing Sims's contention that the age of Mandujano, Cerda and Gaines did not justify their excusal because the prosecution did not challenge two young Caucasian jurors (Karlberg and Blakely), the court found that "the full explanation given by the prosecutor for his challenges of the three jurors [was] not their numerical age but rather their apparent immaturity and inexperience with assuming weighty decisions and responsibilities. Additionally, the prosecutor *did* challenge one prospective Caucasian juror because of her youth." *Id.* at 431. The district court recognized that the trial court's ruling that it was necessary to show a "systematic exclusion" of prospective jurors was incorrect, as the Constitution forbids striking a single juror for a discriminatory purpose, but agreed that the prosecutor gave race-neutral reasons for excluding jurors.

[3] *Batson* involves a familiar three-step analysis:

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima

facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.

*Johnson v. California*, 125 S. Ct. 2410, 2416 (2005) (internal quotations and citations omitted). Here, there is no issue about the first step, as the trial court had no occasion to rule on whether a prima facie case had been made out because the prosecutor moved directly to step two. In these circumstances, "the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

Nor is there much of an issue about the second step. Sims acknowledges that the prosecutor's explanation does not need to be persuasive, and argues only that it apparently proceeded from stereotypical assumptions about how jurors of particular races might react in a case like this. However, the prosecutor's proffered reasons for striking Mandujano and Cerda, which centered on their lack of responsibility, were race neutral.

With respect to the third step, Sims first contends that the California Supreme Court did not cure the trial court's incorrect articulation of the legal standard. Even under de novo review, however, we conclude that the record demonstrates that there was no *Batson* error.

[4] Sims argues that the pretextual nature of the prosecutor's explanations is manifest in the racially disparate pattern of his peremptory challenges, his explicit race-based strategy, and a comparative analysis of the struck jurors with empaneled jurors. Although discriminatory intent may be inferred from the fact that the prosecutor exercised four of his first

twelve peremptory challenges to strike jurors with Hispanic surnames, *see Hernandez*, 500 U.S. at 363, at least one Hispanic-surnamed member of the venire was empaneled. This might indicate that the prosecutor's motive was non-discriminatory. *See Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997). As we have already discussed, the prosecutor commented that he had no reason to strike minority jurors, and in fact had a black and Hispanic witness. *See Hernandez*, 500 U.S. at 370 (noting that the ethnicity of victims and prosecution witnesses could be taken as evidence of the prosecutor's sincerity).

**[5]** Finally, the prosecutor explained that he struck Cerda and Mandujano because he doubted their capacity to exercise the responsibility of jurors in a capital case. The Supreme Court recently made clear that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 125 S. Ct. 2317, 2325 (2005). In *Miller-El*, comparative analysis undermined the proffered race-neutral bases for striking two black veniremen because nonblacks who served on the jury should have been excluded for the same reasons. However, here, the prosecutor's explanation for striking Cerda and Mandujano was consistent with leaving two young whites, Karlberg and Blakely, on the jury. The record is clear that Cerda, unlike Karlberg and Blakely, waffled in response to questions about the imposition of the death penalty.[10] Although Mandujano looked like a very strong juror, he was younger than Karlberg

---

[10]Sims's suggestion that the California Supreme Court and the district court crafted an additional ground that Cerda had equivocal feelings about the death penalty is misplaced, as Cerda's equivocal responses to questions about the death penalty showed lack of maturity that reasonably led the prosecutor to doubt her ability to "take on" a death case. *Cf. Miller-El*, 125 S. Ct. at 2332 (explaining that a court's "substitution of a reason for eliminating [a prospective juror] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions").

and Blakely and the only college student, so the prosecutor's stated nondiscriminatory reasons for striking him are plausible. Therefore, Sims's comparative argument fails.

IV

Sims claimed in his state habeas petition to the California Supreme Court and in his federal petition that his right to an impartial jury was violated when a member of his jury, Marlene Mauro, met with a friend who had served on Padgett's jury, agreed to write a book with her, and told this to other jurors.

He submitted the declaration of Sarah Nordell, a Sims juror, in support. Nordell avers that Mauro related to some of the Sims jurors that she learned about her friend's service on the Padgett jury when they met at a beauty shop and discovered that both occupied the same seat in the jury box, that she and her friend were thinking of writing a book together about the two trials titled something like "Seat Number 3," and that they were both looking forward to getting together, once the Sims trial was over, to compare their experiences as jurors and to work on their book.[11] The supreme court summarily denied relief, and the district court denied Sims's request for discovery and for an evidentiary hearing on the claim. It held that Nordell's declaration does not establish any improper communication.

[6] Sims contends that the unauthorized communication between Mauro and her friend is presumptively prejudicial

---

[11]The state suggests that the Nordell declaration has multiple layers of hearsay and so Sims did not present the California Supreme Court with competent evidence of this allegation, thus making it noncognizable on federal habeas review. It is unclear to us that this point was raised in district court, but in any event, we decline to avoid the issue on this basis. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1189-91 (9th Cir. 1993) (considering two juror affidavits filed two years after petitioner was sentenced that recounted the remarks of a third juror).

under *Mattox v. United States*, 146 U.S. 140 (1892), and *Remmer v. United States*, 347 U.S. 227 (1954). In *Mattox*, the bailiff told jurors after the jury had retired to deliberate that this was the third fellow the defendant had killed. The Court held that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is made to appear." *Mattox*, 146 U.S. at 150. In *Remmer*, an unnamed person communicated with a juror and remarked that he could profit by bringing in a verdict favorable to the petitioner. Elaborating upon *Mattox*, the Court declared that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[.]" *Remmer*, 347 U.S. at 229. In Sims's view, the Mauro contact was especially pernicious as it gave Mauro a real, or perceived, pecuniary interest in the outcome of the case. For this he relies on our statement in *Dyer v. Calderon*, 151 F.3d 970, 982 (9th Cir. 1998) (en banc), that a juror who has "the hope of writing a memoir . . . introduces the kind of unpredictable factor into the jury room that the doctrine of implied bias is meant to keep out."

[7] *Dyer* involved the situation where a prospective juror perjured herself during voir dire, whereas the alleged impropriety here arose after the juror was empaneled. Whether or not *Dyer*'s comments about the "hope of writing a memoir" apply in our circumstances is academic, however, because, without condoning the contact — which the state agrees was unfortunate — we see no prejudice resulting from it. "A communication is possibly prejudicial, not *de minimis*, if it raises a risk of influencing the verdict." *See Caliendo v. Warden*, 365 F.3d 691, 697 (9th Cir. 2004) (so holding in a case where the case agent talked to several jurors for twenty minutes in the hallway outside the courtroom, and identifying factors that may inform the decision whether the communication raised a risk that the verdict was influenced). Here, taking Nordell's

declaration as true, Mauro's unauthorized communication did not risk influencing the verdict. The Padgett juror was not involved in any way with the Sims trial; she was not a party, a witness, or a court official. The contact was fortuitous and the communication was of a relatively innocuous nature in that it centered on the serendipity of two friends ending up as jurors in related trials sitting in the same seat. Even if Mauro planned to write a book about "Seat Number 3," there is no suggestion that she had a financial interest in any particular outcome. This is quite unlike the suggestion by a third-party in *Remmer* that the juror could make a deal, or the bribery of a juror by a co-defendant in *United States v. Dutkel*, 192 F.3d 893, 894-95 (9th Cir. 1999). As appears from Nordell's declaration, Mauro intended to wait until after Sims's trial to discuss her experiences. And there is no indication that Mauro's communication had any actual impact on her or anyone else. The connection between the allegations contained in the Nordell declaration and any pecuniary interest on Mauro's part is simply too tenuous to raise a serious concern about undermining impartiality. In these circumstances, the unauthorized communication raised no risk of influencing the Sims verdict. *See United States v. Armstrong*, 654 F.2d 1328, 1333 (9th Cir. 1981) (finding no prejudice from juror's receiving obscene phone calls from an unknown person regarding the juror's treatment of another juror, as the calls did not refer to the merits of the case, were not threatening, and were not identified with either party).

Sims contends that he should at least have been accorded discovery or an evidentiary hearing on the basis of allegations in his petition, but we see no abuse of discretion. *See Villafuerte v. Stewart*, 111 F.3d 616, 633 (9th Cir. 1997) (per curiam) (noting that abuse of discretion is the standard of review). Discovery is indicated where specific allegations give the court reason to believe that a petitioner may be able to demonstrate that he is entitled to relief. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997). An evidentiary hearing is required under pre-AEDPA law if "(1) the petitioner's allega-

tions would, if proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts." *Silva v. Woodford*, 279 F.3d 825, 853 (9th Cir. 2002) (quoting *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997)). Only three things are alleged in Sims's petition that were not encompassed in the Nordell declaration: that Mauro's friend told Mauro information from Padgett's testimony shifting blame to Sims, that Padgett had been convicted and that, in the friend's opinion, Padgett was a young, beautiful girl who had wasted her life by getting involved with Sims. Assuming the truth of these statements, they could not have had a substantial or injurious effect on the verdict. At trial, Sims did not attempt to exculpate himself by blaming Padgett; indeed, the evidence showed that Sims directed, and committed most of the conduct in furtherance of the crimes, himself. The friend's opinion of Padgett could have had no effect on the verdict at all. And the fact that a number of jurors knew about Padgett's conviction was aired before the district court, which concluded that any such knowledge was rendered insignificant by the overwhelming evidence of Sims's guilt. This decision is not pursued on appeal, and we can see no way in light of it that Sims's allegation that Mauro knew about Padgett's conviction, if proved, would entitle him to relief.

**Volume 2 of 2**

V

Sims maintains that his rights to due process and a nonarbitrary sentence were violated when the prosecutor told the jury during closing argument in the penalty phase that evidence about Sims's abusive childhood did not qualify as mitigating evidence and was therefore irrelevant to the jury's deliberations. The state responds that this is not what happened.

[8] At the penalty phase the jury was instructed in accordance with California Penal Code § 190.3 and 1 California Jury Instructions, Criminal (CALJIC) 8.84.1 (1986 rev.). The instruction identifies eleven factors that a juror must consider in aggravation and mitigation of a capital crime. Factor (k) is the last of these and is a "catch-all" factor that directs the jury to consider "any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."[12]

[9] Sims contends that the prosecutor's arguments negated this instruction in two respects: first, by telling the jury that the abuse Sims suffered during his childhood, and the depression traceable to it that he suffered as an adult, did not qualify as mitigating evidence in any context when he stated that "if, in fact, it were a mitigating factor that a person had a bad

---

[12]With respect to factor (k), the jury was instructed:

In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account, and be guided by the following factors if applicable . . . K, any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. . . . You, and each of you, are the sole judges of whether a factor is an aggravating or a mitigating factor.

childhood, that would apply to virtually every violent felon currently incarcerated"; and second, by stating that Sims's background was not a mitigating factor because there was "nothing to bridge the background of what happened in [Sims's] family to the murders that we have dealt with here." Sims argued the same points to the California Supreme Court, which concluded that "[t]he prosecutor's remarks, in general, fall within the bounds of proper argument." *Sims*, 5 Cal.4th at 464. It explained that "[f]or the most part, he did not imply that the jury should disregard the evidence of defendant's background, but rather that, in relation to the nature of the crimes committed, it had no mitigating effect. 'A prosecutor does not mischaracterize such evidence [offered in mitigation] by arguing it should not carry any extenuating weight when evaluated in a broader factual context.' " *Id.* (internal citations omitted). The supreme court thought that the prosecutor's comment that the troubled background of a defendant does not constitute mitigating evidence might have tended to suggest incorrectly that the jury could not consider such evidence in mitigation, but that any such suggestion was harmless beyond a reasonable doubt given defense counsel's vigorous argument that Sims's background had mitigating relevance and instructions that specifically told the jury to consider as mitigating the evidence relating to Sims's childhood. *Id.* In these circumstances, the court concluded that there was no reasonable possibility the jury was misled to believe it could not consider Sims's background in mitigation. The district court agreed. As it read the prosecutor's summation, he never told the jury to disregard Sims's history of abuse but instead argued that the evidence lacked mitigating weight because it was unexplained, but that even if it could be viewed as somehow improper, any error was cured by the instructions that admonished the jurors that the prosecutor's remarks were merely argument and that the court would instruct them on the law. We agree with both courts.

The controlling standard is "whether there is a reasonable likelihood that the jury has applied the challenged instruction

in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990); *Brown v. Payton*, 125 S. Ct. 1432, 1440-41 (2005). The Eighth and Fourteenth Amendments require that the sentencer, "in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (emphasis in original) (footnotes omitted). If there is constitutional error, that is, if inappropriate comments were made and there is a reasonable likelihood that because of them the jury applied factor (k) in a way that prevented consideration of relevant mitigating evidence, then *Brecht* harmless error analysis applies. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998).

In his argument the prosecutor told the jury to be guided by the court's instructions, which list factors in mitigation, and to make its determinations based upon the instructions. He stated that the various factors in mitigation and aggravation are the law. He explained that mitigating facts would be an aspect of the crime or the individual that make the crime or the individual less vicious, cruel, painful, and deserving of the ultimate punishment. He emphasized that the statute indicates that "you shall consider" the various factors in aggravation and mitigation if applicable. The prosecutor went through each of the aggravating and mitigating factors, arguing which he believed applied. When he got to factor (k), he explained

> Now, in this respect, we get into areas of sympathy. Any sympathetic or other aspects of the defendant's character or background. In this you can consider background, family, anything else . . . you can consider whatever you want to find sympathy or pity for the defendant, even though it does not relate to the other factors in mitigation or aggravation.

Discussing Dr. Vicary's testimony and Sims's depression, the prosecutor again stated "[i]t is the law you can feel sympathy

and pity for a defendant if you deem it appropriate, if you attach a moral or sympathetic value to that."

The prosecutor described evidence of Sims's background as "shocking." He stated that he had no evidence to contradict it, that it should be taken at face value, and that it paints a very ugly picture. He then posed the rhetorical question: What does it mean? The prosecutor's answer was: "There is nothing to bridge the background of what happened in that family to the murders that we have dealt with here, nothing to connect it." Relying on Vicary's testimony that most people in prison for violent offenses were themselves the victims of abuse when they were younger, the prosecutor stated that "if, in fact, it were a mitigating factor that a person had a bad childhood, that would apply to virtually every violent felon currently incarcerated. If that were, therefore, a mitigating factor, then you would be emptying prisons because it would apply to virtually everybody."[13] The prosecutor pointed out that Vicary never said that mental disease or defect or emotional disturbance were produced by the acts perpetrated on Sims's family. The prosecutor contrasted the absence of a bridge for these murders with the bridge that might exist, for example, in an offense against Sims's stepfather, or an offense involving rape or child abuse. He noted that Vicary did testify that Sims suffered depression, child abuse, and low self-esteem, but argued that it did not result in a mitigating factor because, as Vicary also testified, Sims's depression was somewhere between the mental illness suffered by 20 million people and that suffered by people in Boston when the Celtics lost the playoffs — which, the prosecutor submitted, does not mitigate three murders and two attempted murders.

---

[13]Vicary testified during the sentencing phase that "the vast majority" of people who are in prison for violent sexual offenses, rape, and child molesting, were, themselves, the victims of some sort of abuse when they were younger. He also testified that "in the vast majority of cases" that people who commit acts of premeditated murder, were themselves abused as children.

**[10]** Overall, the prosecutor's statements do not suggest that the jury *cannot* consider Sims's background as a mitigating factor but rather that it *should not* find that his background, shocking though it was, mitigated the vicious murders he committed and attempted. *Cf. Payton*, 125 S. Ct. at 1436-37 (describing the prosecutor's argument there as erroneously telling the jury that it *could not* consider post-crime reform and religious conversion as mitigating under factor (k)). He emphasized that the jurors must follow the instructions, must consider mitigating evidence, must take Sims's background and anything else into account, must take Sims's evidence of abuse at face value, and must feel sympathy and pity if the jury deems it appropriate. Given these entirely correct statements, we cannot conclude that the prosecutor's remarks about a missing bridge or emptying prisons created a reasonable likelihood that the jury misapplied the factor (k) instruction so as to preclude consideration of Sims's background. *See Boyde*, 494 U.S. at 384-86 (rejecting contention that prosecutor's arguing that the mitigating evidence did not "suggest that [petitioner's] crime is less serious or that the gravity of the crime is any less," and that "[n]othing I have heard lessens the seriousness of this crime" undermined the factor (k) instruction).

**[11]** Even if the jurors heard the prosecutor's closing differently from the way we have read it, and even if the jurors inferred from any of his remarks that he believed Sims's background should be ignored as the California Supreme Court concluded, it is evident that in the whole context of the case, the prosecutor's remarks could not have substantially influenced the verdict. The court admonished the jury that statements of the attorneys were simply argument, and that the jury would determine what the evidence was and the court would instruct on the law. The prosecutor reminded the jury that the court's instructions would define the law and that the instructions must be followed. The instructions clearly stated that the jury "shall" consider "any sympathetic or other aspect of the defendant's character or record that the defendant

offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." Sims presented significant evidence of horrific abuse and what impact that abuse had on him. The prosecutor accepted the evidence as true and acknowledged it was "shocking." Defense counsel told the jury that "what [he and the prosecutor] disagree on, however, is the significance of the mitigating factor or factors and what weight should be accorded them." He emphasized that factor (k) is the "sum and substance of Mitchell's life before December 2, 1985." Sims's attorney countered the prosecutor's "bridge" argument by explaining that it was wrong, and that while Sims had choices as the prosecutor argued, the "scar tissue builds up and you keep it inside and then it comes out and it explodes in some people." He explained why the jury should weigh the evidence of Sims's childhood background and adult depression heavily as factors in mitigation. Finally and most importantly, for the jury to have believed it could not consider Sims's mitigating evidence, it would have had to believe that Dr. Vicary conducted an extensive examination of Sims, and that Sims's mother, his sister, his stepbrother, and his wife came out to California to testify, for naught. We think this is unlikely, as the Court thought of the similar situation in *Boyde. See Boyde*, 494 U.S. at 383-84 (observing that it is unlikely that reasonable jurors would believe that the court's instructions on factor (k), even if ambiguous, transformed all of the defendant's favorable testimony into a "virtual charade"). We thus conclude that any *Boyde* error was harmless.

## VI

Although trial counsel, Morton Borenstein, presented evidence at the penalty phase about Sims's abusive childhood, Sims contends that he failed to present expert testimony establishing: (1) that Sims suffers from Post-Traumatic Stress Disorder (PTSD) as a result of the abuse he suffered as a child; (2) that the abuse Sims suffered played a direct role in his involvement with Padgett and in the crimes at issue; (3)

that Sims has organic brain damage; and (4) that Sims demonstrated good adaptability to confinement. Sims argues that expert testimony establishing all of these points was readily available and if the jury had known about the full range of mitigating evidence, it is highly likely that Sims would not have been sentenced to death. The district court conducted an evidentiary hearing on this issue and found that Borenstein's performance was neither deficient nor prejudicial. In a federal habeas action factual findings by the district court are accepted unless they are clearly erroneous. *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995) (as amended).

Borenstein had been a deputy public defender for sixteen years and was a Grade IV (the highest grade) defender at the time he was assigned to Sims's case. He had tried a number of special circumstances cases. Although the Sims case was the first he had tried through the penalty phase, Borenstein had been preparing to do capital cases for a long time. He attended seminars and meetings about the death penalty, watched death penalty trials, and spoke with other attorneys about issues attendant to capital cases. Borenstein worked long hours consistently on Sims's case for eleven months; he was assisted by a paralegal and two investigators as well as by an experienced South Carolina attorney familiar with death penalty issues, Jack Swerling.[14] Borenstein's other cases were reassigned before Sims's trial began and he then worked exclusively on it.

The district court found that Borenstein sent Swerling extensive materials and was in regular communication with him while he prepared Sims's defense. Swerling and his law

---

[14]Borenstein arranged for Swerling's appointment so that Swerling could investigate Sims's background and the South Carolina crimes. Swerling had defended some 100 homicides, four of which involved the death penalty. He was an adjunct professor of criminal trial advocacy at the University of South Carolina Law School, and had served as chair of the criminal law sections of the South Carolina Bar Association and the South Carolina Trial Lawyers Association.

clerk interviewed witnesses and obtained Sims's school and work records. Borenstein traveled to South Carolina personally to speak with family members and witnesses and to view the crime scene.

Borenstein spoke with Sims "a lot" and he or his paralegal visited Sims in jail at least 24 times between March 6, 1986, when Borenstein was assigned to the case, and March 10, 1987, when the trial began.

Borenstein retained the services of two experts: Dr. William Vicary, a forensic psychiatrist, and Dr. Michael Maloney, a forensic psychologist, so that he could have the benefit of opinions from experts in both disciplines. Vicary was a board-certified forensic psychiatrist who received his medical degree from the University of Southern California in 1973 and a law degree from Harvard in 1969. Most of his practice was devoted to conducting evaluations of individuals charged with felonies in the Los Angeles Superior Court. Borenstein gave Vicary a nine-page single-spaced letter outlining the crimes and Sims's background, and Vicary also had extensive conversations with Borenstein, who gave him significant details about Sims's background. Vicary interviewed Sims six times, and interviewed Sims's mother, wife, siblings, and jail deputies. He reviewed police reports, Sims's school, army, and work records, his South Carolina therapy records, psychiatric records, and court records regarding Cranford's prosecution for sexually abusing Margaret. Vicary also conferred with Maloney on the results of Sims's psychological testing. Vicary never told Borenstein that he needed any additional material to evaluate Sims's case, or that additional testing or experts were needed.

Maloney had a Ph.D. in Psychology from the University of Colorado and completed his post-doctoral fellowship at the University of Southern California Medical Center. He was a Diplomate in Forensic Psychology licensed to practice in California since 1970. Maloney was retained to "conduct a psy-

chological evaluation of Sims to determine the existence of any possible mental defenses for the guilt phase, and to identify any factors that could be considered as mitigating evidence in the event the case proceeded to a penalty phase." Borenstein selected Maloney because he had extensive experience in capital cases as well as issues involving allegations of physical, emotional and sexual abuse. Maloney was familiar with the potential impact of physical and sexual abuse on an individual's development. Borenstein also chose Maloney because he would give him an honest opinion and would point him in the right direction if other things were needed. Borenstein sent Maloney the same nine-page letter he sent Vicary, as well as reports of interviews conducted with Sims's family, friends, and high school principal, and Sims's military records. He and Maloney also met several times and discussed the case at length. Maloney interviewed Sims several times and administered several tests, including: the Wechsler Adult Intelligence Scale Revised, the Minnesota Multiphasic Personality Inventory, and the Rorschach inkblot test. Maloney concluded that Sims was of "clearly above average intelligence" and that there were no mental defenses to the crimes. Sims showed a disparity between his Verbal and Performance IQ scores, but Maloney believed that the disparity could be attributed to factors other than neuropsychological deficits. In his opinion, Sims also showed signs of antisocial personality disorder. Maloney never told Borenstein that he lacked any background materials to conduct the evaluation, nor did he suggest that additional testing was needed or that additional experts should be retained. Maloney indicated to Borenstein that he did not believe he would be a good witness for Sims because of what he had discovered in his testing, and Borenstein decided not to have Maloney testify because of this.

Vicary did testify, relating in light of his interviews and investigation that Sims had suffered a lengthy pattern of abuse (along with other members of his family), had been suicidal since the age of fifteen, and had a history of drug and alcohol abuse as well as long-standing feelings of inadequacy, low

self-esteem, despair, shame, and humiliation. He explained that these feelings cause the victims to become more and more frightened that, as they succeed, people will find out who they really are and that they can not actually handle responsibilities. This in turn can result in their intentionally or unintentionally creating a situation so that the anticipated negative feedback occurs. Vicary also opined that Sims suffered chronic depression.

The district court held an evidentiary hearing at which testimony was received from Borenstein and eight experts.[15] The district court found that Borenstein conducted an extensive investigation regarding Sims's background and the crimes,

---

[15]Dr. Whyte, a psychiatrist, testified that he believed Sims suffered from PTSD, alcohol dependence, and a personality change due to organic brain damage; he disagreed with Maloney and Dr. Ornish who determined that Sims suffered from antisocial personality disorder. Dr. Lebowitz, a psychologist licensed as a healthcare provider in Massachusetts, assessed Sims as tormented, impaired and desperate so far as Padgett was concerned. Dr. Venn, a psychologist, diagnosed Sims with PTSD and explained that Sims's history of severe sexual abuse affected him profoundly; that Sims suffers anxiety, depression, and low self-esteem; and that Sims meets the DSM-IV criteria for alcohol dependence, although when he originally interviewed Sims in 1992 and 1993, he diagnosed him with anti-social disorder. Vicary stated that he did not realize that Maloney had administered a shortened version of some tests to Sims; that he did not consider a diagnosis of PTSD; that details of Padgett's life would have helped him explain why the offenses occurred; and that he was prepared to offer testimony that Sims would adapt well to confinement. Dr. Halleck reviewed the expert reports, and Dr. Hamrick, who testified in Sims's South Carolina trial, opined that the difference in Sims's IQ scores would generally indicate at least some mild brain dysfunction. Dr. Delis was a neuropsychologist who found no evidence of brain damage that affected Sims's cognitive ability, or of frontal lobe cognitive dysfunction. Dr. Ornish is a forensic psychiatrist who determined that Vicary's trial assessment of Sims was competent; that Sims had antisocial personality disorder, alcohol dependence and a history of substance abuse, that it was inappropriate to diagnose brain damage solely based on differences between verbal and performance IQ, and that there was no other evidence of brain damage; and that Sims was a textbook sociopath and substance abuser.

retained well-qualified experts experienced in capital cases to whom he reported the results of his investigation, and was not told by either expert that additional information or expertise was needed. With respect to the claims that Sims now makes, the court found that Borenstein identified that brain damage was a possibility, conducted a thorough investigation, and provided the results of his investigation to the experts. Experts testified convincingly at the hearing that the disparity in Sims's verbal and performance IQ was not indicative of brain damage, and that Sims's own calculated actions during the crimes belie any claim that he suffered an impairment in frontal lobe functioning. With respect to PTSD, the court determined that in Vicary, Borenstein hired an expert who was exceptionally qualified to render a diagnosis based on Sims's history of childhood sexual abuse, and Vicary admitted that he had knowledge of PTSD. Finally, the court found that Sims minimized Padgett's involvement in the crimes during conversations with Borenstein and that Borenstein saw signs that Sims was the domineering partner even though he was a "fool" for Padgett. Borenstein discussed Padgett's influence on Sims with Maloney, watched Padgett testify at her trial, and based on all these things, concluded that there was nothing about the relationship that he could effectively use to mitigate the heinous nature of the crimes. Borenstein was also concerned that if he exploited Sims's relationship with Padgett, the prosecution would call her as a witness and if so, that she would testify as she did at her trial that Sims forced her to go to California and how Sims cut rope and laid out which portions he would use to tie up Harrigan's hands and feet, laid out a washcloth and socks that he planned to use to gag the victim, and considered drowning the victim or cutting his throat. Thus, the court found that Borenstein's decision not to present evidence regarding Padgett's effect on Sims was a reasonable strategic decision. Finally, the court found that Borenstein also made a reasonable tactical decision not to pursue future dangerousness because it would open the door for the prosecution to present evidence of a crime that Sims committed in the Army, another structured setting.

Suffice it to say, the district court's findings are fully supported. At the end of the day, Sims's argument turns on a latter-day battle of experts; however, the question is whether *counsel* did all that he was constitutionally required to do at the time. As carefully explained by the district court, it is clear that Borenstein did. Indeed, Sims submitted no evidence during the evidentiary hearing from experts in the legal community that Borenstein's performance fell short of prevailing legal norms.

[12] The legal framework is well-settled. In order to prevail on a claim for ineffective assistance of counsel a defendant must show (1) that his counsel's representation "fell below an objective standard of reasonableness"; and (2) that counsel's deficient performance "prejudiced" the defense. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). Defense counsel "must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available [mitigating] evidence.' " *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. In determining whether counsel's conduct falls within the broad range of professionally acceptable conduct, this court "will not view counsel's actions through the distorting lens of hindsight. Rather, under the rule of contemporary assessment, an attorney's actions must be examined according to what was known and reasonable at the time the attorney made his choices." *Hendricks*, 70 F.3d at 1036 (internal quotations and citations omitted). Counsel has "an obligation to conduct an investigation which will allow a determination of what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the

conclusion of the expert." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999). Finally, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Bell v. Cone*, 535 U.S. 685, 702 (2002).

Borenstein did not fall short of the mark in any of the respects claimed by Sims. *First*, he did not unreasonably fail to retain an expert who could properly analyze the impact of childhood abuse, in particular, PTSD. Vicary was qualified to do so, as he admitted.

*Second*, Borenstein did not unreasonably fail to elicit expert testimony explaining the dynamics of Sims's relationship with Padgett; he informed Vicary about Padgett, and Vicary interviewed Sims a number of times knowing that Padgett was his girlfriend and accomplice. Vicary had nothing positive to say about the dynamics, perhaps because Sims had said that he told Padgett what his plans were and she protested but was scared of him and he wouldn't let her leave. Sims submits that Borenstein could not make a reasonable strategic decision to forego assessing Padgett's impact on Sims because he could only make this call if it were informed by an investigation into Padgett's background. While the investigation supporting counsel's decision not to introduce mitigating evidence must itself be reasonable, *see, e.g., Wiggins v. Smith*, 539 U.S. 510, 522-23, 526 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002), it is immaterial that Borenstein did not investigate *Padgett*'s background because it was *Sims*'s perspective on the relationship that mattered. Sims's experts evidently thought so as well, as their testimony at the evidentiary hearing focused on the relationship from Sims's point of view.

*Third*, Borenstein did not unreasonably fail to pursue the possibility that Sims had organic brain damage. Maloney alerted Borenstein to the possibility, but found none. He did not advise Borenstein to retain a specialist in neurological

impairment to pursue the possibility. Some experts who testified at the evidentiary hearing agreed with Maloney's diagnosis, others didn't.[16] But there is no evidence that Maloney was not qualified; the district court found that he was well-regarded by the defense bar, prosecutors and judges alike. In these circumstances, as we explained in *Hendricks*, attorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would "defeat the whole aim of having experts participate in the investigation." 70 F.3d at 1038, 1039.

*Fourth*, Borenstein did not unreasonably fail to elicit testimony from Vicary about Sims's adaptability to confinement. Vicary's optimistic assessment would have been severely undercut by Sims's bad conduct discharge from the Army for a crime that involved the use of force or violence and which would have been admissible as aggravating evidence during the penalty phase. Cal. Penal Code § 190.3(b). Without doubt Borenstein's decision to keep this door closed was reasonable.

**[13]** In sum, by contrast with other cases in which the Supreme Court or we have found deficient performance,[17]

---

[16]Sims is extremely intelligent, and scored in the 99th percentile on the most sensitive test of frontal-lobe dysfunction, in the top two percent of people in the country on a comprehension test, and average to above average in higher level cognitive functioning but in many ranges is in the top ten percent of the population.

[17]*See, e.g.*, *Wiggins*, 539 U.S. at 510 (counsel performed deficiently where they failed to put on any evidence of petitioner's life history; failed to follow up on preliminary information suggesting that petitioner had a horrific and traumatic childhood; and failed to comply with the standards of performance established in their state and by the ABA at the time of trial); *Williams*, 529 U.S. at 362 (counsel performed deficiently where he did not begin to prepare for sentencing until one week before trial; did not obtain records on petitioner's background; did not obtain petitioner's prison records which revealed adaptability to confinement; and failed to return call of witness who offered favorable testimony regarding peti-

Sims's counsel thoroughly prepared for the penalty phase, retained and informed well-qualified experts upon whom he could reasonably rely, and presented heart-wrenching evidence in mitigation. His performance passes constitutional muster.

---

tioner); *Allen v. Woodford*, 395 F.3d 979 (9th Cir. 2005) (counsel failed to prepare for the sentencing phase of capital case until a week before that phase began and failed to present available mitigation and the failure was deemed harmless); *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc) (counsel billed only 40 hours in preparation for guilt and penalty phases, only substantively met with the client once, and on the day trial commenced, failed to obtain relevant material records, spent less than half the allowed budget and failed to consult relevant experts despite being alerted to "evidence of diabetes and substance abuse . . ."); *Lambright v. Stewart*, 241 F.3d 1201 (9th Cir. 2001) (counsel failed to obtain psychiatric evaluation despite knowing of petitioner's traumatic wartime experience and extensive drug abuse); *Bean v. Calderon*, 163 F.3d 1073, 1078 (9th Cir. 1998) (completely unprepared attorney presented only "disorganized and cursory" penalty phase); *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir. 1998) (counsel's failure "to arrange a psychiatric examination or utilize available psychiatric information also falls below acceptable performance standards"); *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998) (counsel was ineffective for failing to conduct any investigation into defendant's psychiatric history despite evidence that defendant had been treated for mental illness); *Caro*, 165 F.3d at 1228 (counsel's performance was deficient because, although aware of his acute and chronic exposure to toxic chemicals, counsel did not acquire any experts on the effects of chemical poisoning, did not provide the experts who did examine Caro with the information that he had, and failed to properly consult experts); *Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 1999) (petitioner stated prima facie case for ineffective assistance during penalty phase where there was complete failure to investigate family or background despite evidence suggesting petitioner had mental problems); *Jennings*, 290 F.3d 1006 (counsel was ineffective where he failed to inquire into possible child abuse in the family, failed to appoint additional experts to evaluate Jennings's mental state or the possible effects of methamphetamine on a heavy, long-time user, despite the fact that he knew that Jennings had been "strung out" for over a year, did not discuss the effects of Jennings's drug use with Jennings himself, nor did he follow up on a report that Jennings had attempted suicide, that Jennings was schizophrenic, and that his ex-wife believed that he was crazy).

## VII

Sims argues that during the prosecutor's summation at the penalty phase, he made numerous impermissible comments about Sims's silence regarding whether Sims was sorry for the crimes he committed, which invited the jury to penalize him for exercising his Fifth Amendment right not to testify.[18] Borenstein did not make a *Griffin*[19] objection, and Sims claims that this amounted to ineffective assistance of counsel with respect to these statements:

> I was waiting for Mitchell Sims to express remorse, to apologize to somebody for what he had done and what he had taken. What I heard was a preoccupation with getting cigarettes, seeing his girlfriend Ruby Padgett. I did not hear any of that remorse. Anything that would tell me that Mitchell Sims will be living the rest of his life with his stomach in a knot. That he will be preoccupied with the evil he has done. There is nothing like that.

[18]Sims's argument has shifted from his position before the California Supreme Court, where his argument appeared to be that the prosecutor improperly urged the jury to consider his lack of remorse. The supreme court found this argument was procedurally defaulted because Sims failed to object, and that in any event the prosecutor properly suggested that lack of remorse should weigh against the jurors' assigning significance to the mitigating evidence. *Sims*, 5 Cal. 4th at 465. The district court noted that in addition to this point, Sims further contended in his federal habeas proceeding that by referring to his lack of remorse, the prosecutor impermissibly commented on his failure to testify. It concluded that the claim was procedurally barred because the California Supreme Court invoked the contemporaneous objection rule. The district court also found the claim lacked merit, because the prosecutor did not refer to Sims's failure to testify in describing Sims's lack of remorse.

[19]*Griffin v. California*, 380 U.S. 609, 615 (1965) (forbidding comment by the prosecution on the accused's silence). Counsel did object on *Griffin* grounds to the prosecutor's reference to Sims's statement to Perkins on December 26 that he preferred not to discuss what happened inside the store in Hanahan.

. . .

Now, at no time did I hear any remorse. Hear a tear. I mean, we have all felt guilty about things in life. It's a human reaction, but granted, we haven't killed people. We are not mass murderers. But there was no feeling of guilt. There is absolutely no feeling of guilt.

. . .

The life in prison, is he going to spend it brooding and contemplating about the evil he has done? You really think he will? You think he is going to have that knot in his stomach? You think he will think about the lives he has taken? The years he has stolen? Has he yet? Has he yet come out and said to anyone that tearfully he is sorry for what happened, that he thinks about it every day, that he can't sleep at night?

However, the statements must be considered in context. In context, the first statement to which Sims says counsel should have objected is as follows:

Now, many things go into a case in judging what the appropriate punishment should be and we have a statement to Mr. Perkins on the 25th, the taped conversation that I would like you — respectfully ask you to listen to for several reasons — on the 26th, and we have Dr. Vicary who said he interviewed the defendant 6 times for a total of 6 hours.

And I was waiting for those pieces of evidence to hear that Mitchell Sims was sorry. I was waiting to hear that Mitchell Sims felt bad about the years he had stolen. I was waiting for Mitchell Sims to

express remorse, to apologize to somebody for what he had done and what he had taken.

What I heard was a preoccupation with getting cigarettes, seeing his girlfriend Ruby Padgett. I did not hear any of that remorse. Anything that would tell me that Mitchell Sims will be living the rest of his life with his stomach in a knot. That he will be preoccupied with the evil he has done. There is nothing like that.

The second is:

Next day Mitchell Sims calls back Jon Perkins and conversation picks up again about cigarettes. First thing on Mitchell Sims' mind is cigarettes. He has killed 3 people, tried to kill 2 more, and the first thing on his mind is cigarettes; the second one is Ruby.

And he says, "Well, I knew I was doing it," and then kicks in as an afterthought, "Maybe I shouldn't have done it." That's the only thing, the closest thing we have to even remotely showing any remorse for what he did. And that was dropped immediately because he said, "Oh, well, I was drunk."

[colloquy]

Now, at no time did I hear any remorse. Hear a tear. I mean, we have all felt guilty about things in life. It's a human reaction, but granted, we haven't killed people. We are not mass murderers. But there was no feeling of guilt. There is absolutely no feeling of guilt.

Listen to this tape. Listen to the tone of his voice on [that] tape, and ask yourself where is the guilt?

Where is the remorse? Where is the repentance? Where is asking for forgiveness there? You won't find it.

And the third is:

His world, we learned a little bit about when we heard first from Mrs. Sims and then from Detective Yarborough about his fascination with the movie "The Executioner's Song." About Gary Gilmore who was himself a multi-murderer, about how Sims wanted to go out in a blaze of glory. That is his world. Fascination with multiple murderers. That's his world. A life in prison, that's what his world will be like. That's what he will be like. The life in prison, is he going to spend it brooding and contemplating about the evil he has done? You really think he will? You think he is going to have that knot in his stomach? You think he will think about the lives he has taken? The years he has stolen? Has he yet? Has he yet come out and said to anyone that tearfully that he is sorry for what happened, that he thinks about it every day, that he can't sleep at night? That he can't eat? That he feels guilty and he can't take it any longer? Will he spend the rest of his life in remorse or will it be like you hear on the tape: cigarettes, Ruby, me first, satisfy my needs today.

**[13]** Each of these comments is tethered to evidence that was part of the record in the penalty phase, as the district court found. For this reason, Sims's contention—that the prosecution may not argue that the defendant has failed to show remorse by using his silence at trial as the evidence of remorselessness—while true in the abstract, is misplaced. We held in *Beardslee v. Woodford* that "[a] prosecutor's comment is impermissible if it is 'manifestly intended to call attention to the defendant's failure to testify or is of such a character that the jury would naturally and necessarily take it to be a

comment on the failure to testify.' " 358 F.3d 560, 586 (9th Cir. 2004) (quoting *United States v. Tarazon*, 989 F.2d 1045, 1052 (9th Cir. 1993)). However, the situation and the prosecutor's statements in *Beardslee* were both quite different from the situation and the prosecutor's statements here. Beardslee had testified at a preliminary hearing and at the guilt phase. In that light, the prosecutor's comments implied that the defendant's failure to testify at the penalty phase had significance when he stated: "Since you only heard the defendant through the tape recorder and his previous testimony, you were not able to observe his demeanor and sincerity at the time he testified so you, too, could judge if there was any feeling in the man . . . . Wouldn't you expect a man on trial for his life would, through his statements, cry out for forgiveness, cry out for pity? He did not. Never heard any in the statements." *Id.* Nothing similar occurred at the Sims trial or could have been inferred from the prosecutor's remarks, which rested entirely upon statements that Sims himself had made. The prosecutor made no allusion to the difficulty of gauging an absent defendant's credibility. This being so, counsel's failure to object to the prosecutor's statements did not fall below an objective standard of reasonableness.

## VIII

As with the individual claims, we conclude that the cumulative effect of any constitutional errors did not prejudice Sims.

AFFIRMED.

B. FLETCHER, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's disposition of Sims's guilt-phase claims, but I must respectfully dissent from the denial of habeas relief with respect to Sims's death sentence, and in particular from Parts III-B, VI, and IX of the majority opinion.

I view this case through a different lens than does the majority. I conclude that constitutional error infected Sims's trial in two respects that I will elaborate. I then turn to *Brecht v. Abrahamson*, 507 U.S. 619 (1993), to determine whether the constitutional errors had "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 623 (citation and internal quotation marks omitted). I add the gloss of *O'Neal v. McAninch*, 513 U.S. 432 (1995), which instructs that if there is "grave doubt" as to the effect of the constitutional errors, the petitioner is entitled to relief. *Id.* at 436.

In this death penalty case, I take this "grave doubt" standard very seriously and have viewed this case in that light. I conclude that the determination of guilt must stand despite constitutional error. In my view, it did not have a substantial and injurious effect or influence in determining the jury's verdict. There was too much compelling evidence of guilt. However, the constitutional error carried over into the penalty phase, and together with additional error introduced into the penalty phase, engenders "grave doubt" as to what effect or influence the constitutional errors had on the jury's verdict.

The penalty phase was marred by two constitutional errors: the prosecutor's use of Sims's inculpatory statements obtained in violation of *Miranda*, and the prosecutor's insistence that the compelling evidence of Sims's childhood abuse could not be considered by the jury in mitigation. Because there is "grave doubt" as to the effect of these errors, the dis-

trict court's denial of the writ with respect to Sims' death sentence should be reversed.

## I. *Miranda* Error

The majority ignores the fact that the California Supreme Court held that the admission of crucial portions of Officer Perkins's interrogation of Sims violated *Miranda v. Arizona*, 384 U.S. 436 (1966). *People v. Sims*, 853 P.2d 992, 1015 (Cal. 1993).[1] I agree with the California Supreme Court that the admission of Sims's inculpatory statements was error. I conclude further that the manner in which the statements were used by the prosecution had a substantial and injurious effect on the jury's penalty phase deliberations.[2]

---

[1]It held:

> We conclude defendant's statement that he 'had to kill that boy,' his repetition of that statement, and his third statement that the victim would have identified him, were elicited in contravention of *Miranda*. All three statements should have been excluded from evidence. The trial court's denial of defendant's motion to suppress these statements therefore constituted error.

> The three statements constituted a confession, i.e., a declaration of defendant's intentional participation in the murder. (See *People v. McClary*, [ ] 571 P.2d 620 (1977).

853 P.2d at 1015.

[2]Because "the availability of the Fifth Amendment privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites," the Supreme Court has found "no basis to distinguish between the guilt and penalty phases of [a] capital murder trial so far as the protection of the Fifth Amendment privilege is concerned." *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981) (citation, internal quotation marks, source's alteration marks, and footnote omitted). Therefore, *Miranda*'s exclusionary rule regarding improperly obtained unfavorable statements applies with equal force to both the penalty and guilt phases. *Id.* ("Just as the Fifth Amendment prevents a criminal defendant from being made 'the deluded instrument of his own conviction,' [ ], it protects him as well from being made the 'deluded instrument' of his own execution." (internal quotation marks and citations omitted)); *cf. Jones v. Cardwell*, 686 F.2d 754, 756 (9th Cir. 1982) (holding that the Fifth Amendment protects defendant against self-incrimination in non-capital case for purposes of increasing sentence based on judicial fact-finding).

Once having invoked his right to silence and to have an attorney present during questioning, a suspect "is not subject to further interrogation by the authorities until counsel has been made available, unless the accused himself initiates further communication." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). A suspect initiates further communication of his own accord only when he "evince[s] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). If police then begin anew with interrogation of the suspect, the prosecution must demonstrate under the totality of the circumstances that the suspect has knowingly and intelligently waived his previously invoked rights. *Edwards*, 451 U.S. at 486 n.9. "Interrogation" in this context may be express questioning or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

On December 25, Sims unequivocally invoked his rights to silence and to have an attorney present during questioning. Once this occurred, Perkins prepared to leave the interrogation room. Perkins's own testimony then establishes 1) that Sims asked questions narrowly directed at issues relating to extradition, 2) that Perkins responded with a rambling explanation of his role in the investigation and details from the crime scene, and 3) that only after Perkins had related this extensive crime-scene information did Sims state "I had to kill that boy."

The California Supreme Court's determination that Perkins's response was "nonresponsive to [Sims's] inquiry and served no legitimate purpose incident to [Sims's] arrest or custody" was entirely correct. Sims's statement cannot be read to "evince[ ] a willingness and a desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at

1045-46. Rather, Sims was asking simple questions about extradition.[3] Perkins's responses, in contrast, went directly to the substance of the investigation; at one point Perkins even stated that he had "reason to believe that [Sims] and a female companion occupied that room prior to the demise of Mr. Harrigan." This statement was reasonably likely to elicit a response from Sims related to whether or not he had occupied the room, and whether or not he killed Harrigan. Thus, Perkins's non-responsive narrative was tantamount to further interrogation and in violation of *Miranda* and its progeny.

Following this straightforward confession, Perkins continued to ply Sims with details of the murder, even remarking that Harrigan did not need to die in that manner. Both the Supreme Court of California and the district court concluded that Perkins's statements were likely to elicit an incriminating response, and Sims's response that "he would have identified me" should have been suppressed. This conclusion is correct for the reasons stated in those opinions.

The following day, Sims requested to see the Glendale officers once more. When he mentioned that people thought he was crazy and might kill himself, Perkins asked him if he would, and stated that he didn't "seem like that kind of guy." Sims remarked that he was not suicidal, and that he was "not a murderer either." Perkins's statements until that point cannot be characterized as interrogation, as they were not "reasonably likely to elicit an incriminating response." I have no quarrel with the admission of this statement.

---

[3]The district court's determination that Sims inquired about "why Perkins was there, and his authority for being there" is unsupported by the record. Indeed, the pages cited by the district court demonstrate that Perkins understood Sims's questions to be related to "purely extradition." Despite this understanding, Perkins continued to speak of subjects far afield from extradition. The district court's factual finding in this regard is clearly erroneous.

However, when Perkins then asked Sims "What does that mean?" Perkins was posing a question that was likely to elicit an incriminating response. This is exactly what happened, as Sims confessed, "That means that I just got drunk, and I didn't know what the fuck I was, I knew I was doing it, but I shouldn't [have] done it." The district court concluded that this statement should have been suppressed. I agree.

In all, I conclude that three of the four incriminating statements were admitted into evidence by the trial court in violation of *Miranda* and its progeny.

## II.    The *Miranda* Error's Injurious Effect

The majority concludes that whatever Fifth Amendment error occurred was harmless with respect to both phases of Sims's trial. Though I cannot say that the admission of Sims's confessions to Officer Perkins had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623 (citation and internal quotation marks omitted), at the guilt phase of Sims's trial, it did have such an effect on the penalty phase deliberations.

Throughout both phases of the trial, the jury heard numerous and extensive references to the December 25 and 26 incriminating statements, both during the presentation of the evidence and the prosecution's argument. During the guilt phase, Officer Montecuollo testified that Sims had confessed that "I had to kill that boy" during the December 25 interview. The jury heard the same statement twice more during Montecuollo's cross examination, and twice more on re-direct. Officer Perkins corroborated that testimony, stating that when he described the investigation and the crime scene, Sims twice said, "I had to kill that boy," then that "he was going to identify me." The statement "I had to kill that boy" was then repeated once more during direct testimony, four more times on cross examination, and two more times on re-direct.[4] Offi-

---

[4]Sims's explanation that "he was going to identify me" was heard by the jury twice more during cross examination and once more during re-direct.

cer Perkins went on to testify as to the December 26 interview, recounting Sims's admission that, "That means that I just got drunk. I didn't know what the fuck I was — I knew what I was doing but shouldn't have done it." This same statement was heard again by the jury when the prosecution played the cassette tape of the December 26 conversation between Perkins and Sims. A copy of the transcript of that taped conversation was admitted into evidence over defense counsel's objection, read in part to the jury during the prosecution's closing, and allowed into the jury room during deliberations.

The use of these incriminating admissions was central to the prosecutor's closing argument in the guilt phase. After using the statement "I had to kill that boy" four more times during the closing to show intent to kill, the prosecutor used the phrase as a refrain in his rebuttal. In bolstering Officer Montecuollo's credibility, the prosecutor stressed three times how important the statement was. The prosecutor explained that Montecuollo's failure to remember Sims's explanation that Harrigan could have identified him was not significant because "[Montecuollo and Perkins] both remember the key important part: *I had to kill that boy*. That's the important part of that conversation" (emphasis added). The prosecutor then continued:

> It is only natural that things — that people's memories begin to fade, accept [sic] for the really important things, and the important thing was: *I had to kill that boy*.

> But here is a man that is coming into court and telling you the honest truth. That's what he recalls. And it is important because of what he recalls. He recalls the important part of that conversation, which is: *I had to kill that boy*.

(emphasis added). The prosecutor then spent a comparable amount of time expounding on the importance of Sims's other

admission: "I knew I was doing it, but I shouldn't [have] done it." Repeating the statement several times, the prosecutor argued that it conclusively confirmed Sims's intent to kill.

During the penalty phase, the prosecution again played the tape of Sims's admission that "I just got drunk, and I didn't know what the fuck I was, I knew I was doing it, but I shouldn't [have] done it." Then, in his penalty phase closing argument, the prosecutor reiterated once again for the jury Sims's two most damning statements: "I had to kill that boy" and "I knew I was doing it but I shouldn't [have] done it." Specifically, the prosecutor used "I had to kill that boy" in conjunction with a hypothesis about how the murder might have taken place:

> We can assume that John Harrigan would want to live. Raises his head out of the water and it would take Mitchell Sims to push his head back under the water. What did Mitchell Sims say? "I had to kill that boy." And that's how he killed John Harrigan.

In sum, the improperly admitted statements were repeated throughout the proceedings, becoming a refrain for the prosecution.

The prosecution's use of these statements prejudiced Sims's capital sentencing proceeding in two ways. First, the use of Sims's statements reflecting his intent to kill Harrigan completely foreclosed any residual doubt argument Sims might have mounted with respect to his intent to kill. We have recently reiterated that reliance on residual doubt is an acceptable penalty phase strategy. *See Williams v. Woodford*, 384 F.3d 567, 617-17 (9th Cir. 2004). Here, the evidence of intent was strong enough that, after considerable review and study of the record, I cannot say Sims's statements to Perkins had a "substantial and injurious effect or influence" on the jury's determination of Sims's intent beyond a *reasonable* doubt, and therefore I agree with the majority that Sims was not prej-

udiced at the guilt-phase. However, there were lingering questions about Sims's intent to kill that, absent the introduction of Sims's admission "I had to kill that boy," could have prevented the jury at the penalty phase from finding Sims's intent beyond *all possible* doubt (the standard for lingering doubt). During the guilt phase, defense counsel argued that evidence such as the cut phone cord, Sims's deliberate misstatement to Sicam and Spiroff that he and Padgett were headed to San Francisco, the slackness of the ligature around Harrigan's neck, and the fact that the bathtub drain was unplugged, raised a doubt as to Sims's intent to kill. Sims's admissions blunted any potential impact this evidence may have had in support of a residual doubt theory. Unsurprisingly, the defense's argument that Sims lacked intent was entirely abandoned during the penalty phase, and defense counsel did not press a residual doubt argument with any specificity or vigor. Meanwhile the prosecutor was able to argue very effectively during the penalty phase that the case had been proved beyond all possible doubt. Had Sims's crucial statements to Officer Perkins — "I had to kill that boy" and "I knew I was doing it" — been excluded (as they should have been), the prosecutor's argument on this score would have been open to challenge and the residual doubt question would have been very much in play, as several of Sims actions appear inconsistent with an intent to kill. The effect of admitting the statements, then, was to eliminate an entire legitimate and effective argument in favor of sparing Sims's life.

Second, the prosecutor used Sims's statements as the foundation of his extensive argument that Sims lacked remorse. The prosecutor argued:

> . . . [N]o remorse. Now, many things go into a case in judging what the appropriate punishment should be and *we have a statement to Mr. Perkins on the 25th . . . [and] on the 26th . . . .*
>
> And I was waiting for those pieces of evidence to hear that Mitchell Sims was sorry. I was waiting to

hear that Mitchell Sims felt bad about the years he had stolen. I was waiting for Mitchell Sims to express remorse, to apologize to somebody for what he had done and what he had taken.

What I heard was a preoccupation with getting cigarettes, seeing his girlfriend Ruby Padgett. I did not hear any of that remorse. Anything that would tell me that Mitchell Sims will be living the rest of his life with his stomach in a knot. That he will be preoccupied with the evil he has done. There is nothing like that.

*What did we hear on the 25th?* Mitchell Sims looking out for number one. "What is going to happen to me in terms of extradition. I want to see Ruby. I want to go the same place Ruby goes." . . .

*. . . And then he said, "I had to kill that boy." And Mr. Perkins indicated, went through the facts of the Glendale case. "Well, you know this kid was tied up and bound and gagged." Jon Perkins says, "Mitch he didn't have to die." At that point, Mitchell Sims says, "Well, I didn't want him to identify me."*

Next day Mitchell Sims calls back Jon Perkins and conversation picks up again about cigarettes. He has killed 3 people, tried to kill 2 more, and the first thing on his mind is cigarettes; the second one is Ruby.

*And he says, "Well, I knew I was doing it," and then kicks in as an afterthought, "maybe I shouldn't have done it." That's the only thing, the closest thing we have to even remotely showing remorse for what he did.*

(emphasis added).

Sims's lack of remorse was thus the subject of extended discussion by the prosecutor, and Sims's December 25 and 26 statements to Officer Perkins were at the heart of the prosecutor's portrayal of Sims as selfish, unfeeling, and utterly without conscience. The record reflects that the prosecutor repeatedly used the conversations between Sims and Officer Perkins to portray Sims as remorseless. The prosecutor began by drawing the jury's attention to the most damning of Sims's statements taken in violation of *Miranda*: "I had to kill that boy" and "Well, I knew I was doing it . . . maybe I shouldn't have done it." The prosecutor told the jury that, as he listened to the Perkins interviews, he "was waiting for those pieces of evidence to hear that Mitchell Sims was sorry"; he "was waiting to hear that Mitchell Sims felt bad about the years he had stolen"; he "was waiting for Mitchell Sims to express remorse, to apologize to somebody for what he had done and what he had taken." What the prosecutor heard instead "was a preoccupation with getting cigarettes, seeing his girlfriend Ruby Padgett"; the prosecutor "did not hear any of that remorse." The question "where is the remorse?" appears three times in the prosecutor's argument, along with two other similar formulations: "Where is the knot in his stomach?" and "Where is asking for forgiveness there?" With these questions, the prosecutor drew out the contrast between the type of remorse he would have expected to hear from a person who "ha[s] a conscience," and the Sims's passionless confessions — particularly, "Well, I knew I was doing it . . . maybe I shouldn't have done it," a statement the prosecutor characterized as "the only thing, the closest thing we have to even remotely showing remorse for what he did." The prosecutor's extensive remarks on the subject of remorse, a point of emphasis in his argument that Sims should be put to death, thus arose directly from the prosecutor's discussion of Sims's constitutionally inadmissible statements to Officer Perkins. Sims's confessions were the force behind the no-remorse argument.

"As the Supreme Court has observed: 'A confession is like no other evidence. Indeed, the defendant's own confession is

probably the most probative and damaging evidence that can be admitted against him.' " *Hayes v. Brown*, 399 F.3d 972, 986 (9th Cir. 2005) (en banc) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)) (further citation and internal quotation marks omitted). So it was here. By presenting and emphasizing to the jury Sims's own admission of intent, the prosecution foreclosed any residual doubt argument Sims might have made, and Sims's December 25 and 26 statements became the centerpiece of the argument — featured prominently throughout the prosecutor's closing — that Sims lacked remorse for his crime.

In spite of the ghastly nature of the crime, a death sentence was not a foregone conclusion in this case. Sims's decade of tragic abuse at the hands of his stepfather was, even in the prosecutor's characterization, "shocking."[5] Additionally, had the prosecutor not been able to invoke Sims's statements taken in violation of *Miranda*, the jury might have retained lingering doubt as to Sims's intent and would not have been presented with the prosecutor's extensive argument that Sims lacked any remorse for his crime. In light of the evidence Sims presented in mitigation and the twin advantages the prosecution gained by its use of Sims's December 25 and 26 statements, I must conclude that, with respect to the penalty phase, the *Miranda* violations had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation and internal quotation marks omitted). I would find Sims entitled to relief from his sentence of death on this error alone.

### III.  Mitigating Evidence: The Prosecutor Misleads the Jury

I also strongly disagree with the majority's rejection (in

---

[5]The details are so gruesome that I do not belabor them here. If the reader needs to refresh his or her memory, turn to the majority opinion, at 13485-86.

Part VI of the opinion) of Sims's Eighth Amendment claim that the prosecutor repeatedly misstated the law as to the jury's use of mitigating evidence. The prosecutor misstated the law to the jury in two respects: first, by telling the jury that evidence of a childhood characterized by abuse is simply not a mitigating factor at all because it would apply to practically all criminals; and second, by advising the jury that evidence of Sims's background does not qualify as mitigating evidence because there is no connection or "bridge" between that background and Sims's crime. The prosecutor's use of these misstatements was pervasive during his closing. As I shall explain, I cannot agree with the majority's conclusion that these misstatements were merely arguments that the jury *should not* attach weight to Sims's mitigating evidence: the prosecutor's misstatements of the law created the overwhelming impression that the jury *could not* consider evidence of Sims's dreadful childhood, which was the heart of the evidence he offered to convince the jury to spare his life.[6] As a

---

[6]The record offers scant support for the majority's conclusion that the confusion sown by the prosecutor's improper arguments was in any way dispelled by the court's instructions or the arguments of defense counsel. The court's instructions on mitigating evidence were of the most general nature, were far removed in time from the prosecutor's misstatements of the law, and were not addressed to counteract these misstatements. When the prosecutor presented his erroneous theories, no curative instruction was given. Even worse, when defense counsel objected, the court overruled him, thereby implicitly placing the court's own imprimatur on the prosecutor's improper argument.

Nor could the jury's confusion have been ameliorated by the arguments of defense counsel, who at first suggested that no bridge was required and later argued as if it were. Moreover, it is doubtful whether the arguments of defense counsel alone could ever suffice to cure misleading arguments by the prosecutor, as the jury is likely to view a debate between defense and prosecution as merely inviting resolution of the issue by the jury. Such a result does not cure the constitutional violation. *See Payton v. Woodford*, 299 F.3d 815, 825-26 (9th Cir. 2002) (en banc) ("In effect, the court's instruction delegated to the jury the legal question whether factor (k) allowed consideration of Payton's mitigating evidence. Nothing prevented the jury from refusing to consider Payton's mitigating evidence and thereby reaching an unconstitutional result."), *vac'd on other grounds*, 538 U.S. 975 (2003), *on remand at Payton v. Woodford*, 346 F.3d 1204 (9th Cir. 2003) (en banc), *rev'd sub nom. Brown v. Payton*, 125 S. Ct. 1432 (2005).

result, the capital sentencing proceeding did not comport with the standards of *Lockett v. Ohio*, 438 U.S. 586 (1978), and its progeny, which require that the capital sentencer consider all relevant mitigating evidence.

In his penalty phase closing, the prosecutor argued:

> Now, let's talk about Mitchell Sims because there was evidence put on about his background. Evidence — certainly is shocking about the evidence. . . . It certainly paints a very ugly picture. . . . The question is: what does it mean?

> We have had a psychiatrist come in and testify to tell us what it meant. . . . I have a notation: no bridge. There is nothing to bridge the background of what happened in that family to the murders that we have dealt with here. Nothing to connect it.

> And I kept waiting for something to connect it up. Connect it up. What does it mean that person has had an abused childhood? What does it mean in terms of this case right here? There is nothing to connect it up because when Dr. Vicary testified, he said that if you go up to state prison and you talk to violent criminals, murderers, and rapists, and whatever, you find a violent childhood. If you go up to prison and find and talk to murderers and rapists and robbers, you are not going to find a lot of Harvard M.B.A.'s. You are going to find people who in turn were abused as children. What does that mean in terms of mitigation? *If, in fact, it were a mitigating factor that a person had a bad childhood, that would apply to vertually [sic] every violent felon currently incarcerated.*

> *If that were, therefore, a mitigating factor, then you would be emptying prisons because it would*

*apply to vertually [sic] everybody. . . . Were it a mitigating favor that a person had a bad childhood, then you would have no death penalty statute at all.*

(emphasis added). After defense counsel objected to this line of argument and was overruled, the prosecutor continued:

So, the question is: what does it mean? Let's put it in context. Because we are dealing with a common background to a criminal population. . . .

Now, I kept waiting for a bridge. Something to connect this to the offenses here. Some kind of reason why it should be a mitigating factor. . . .

. . .

*So, again, we are searching for a bridge, we are searching for some kind of bridge. I suppose if the offense was against his stepfather, certainly it would be relevant, then, wouldn't it? No question about that.*

*If the offenses here were sexual in nature, for example, rape murders, child molestation murders, then there would be a nexus, you would have that connection there, wouldn't you? But there aren't. I mean, there is no bridge. There is no bridge that bridges this bad background to anything we have in the case before us.* We have murders of people who were strangers. People who were friends. People who were delivering pizzas. There is no connection. Also, we have a gap in time. What happened to Mr. Sims, as bad as it was, was ten years before the crimes in question. A lot of water under the bridge in ten years. The more you analyze it, and I know it sounded terrible when we heard it, we can't help but be affected by it, but it is the jury's job to avoid —

dispassionately analyze it. *What does it mean in terms of assigning a mitigating factor to it? What does it mean in terms of punishment? It doesn't mean a thing. There is no mitigating factor there.*

(emphasis added).

The Supreme Court has repeatedly held that, in a capital sentencing proceeding, "a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death." *Penry v. Lynaugh*, 492 U.S. 302, 318 (1989), *overruled on other grounds*, *Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978). The sentencer must be able not only to consider but also to "*give effect to* all relevant mitigating evidence offered" by a capital defendant. *Boyde v. California*, 494 U.S. 370, 377-78 (1990) (emphasis added). The Supreme Court has refused to tolerate "[a]ny barrier" to the proper use of mitigating evidence: "Whatever the cause, the conclusion would necessarily be the same: Because the sentencer's failure to consider all of the mitigating evidence risks erroneous imposition of the death sentence, in plain violation of *Lockett*, it is our duty to remand . . . for resentencing." *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990) (citations, internal quotation marks, and source's alteration marks omitted).

Regarding the definition of relevant mitigating evidence, the Supreme Court has recently reaffirmed the breadth of the range of evidence that the capital sentencer must be instructed to consider:

> "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Thus, a State cannot

bar "the consideration of evidence if the sentencer could reasonably find that it warrants a sentence less than death."

*Tennard v. Dretke*, 124 S. Ct. 2562, 2570 (2004) (quoting *McKoy*, 494 U.S. at 440, 441) (further citations, internal quotation marks, and source's alteration marks omitted). Applying this "low threshold for relevance," *id.*, the Supreme Court specifically rejected the view, espoused by the Fifth Circuit, that mitigating evidence is only relevant if it demonstrates that the defendant had "a uniquely severe permanent handicap" and that such condition bore a "nexus" to the crime. *Id.* at 2569-70, 2573. The Supreme Court has subsequently characterized the "nexus" requirement as "a test we never countenanced and now have unequivocally rejected." *Smith v. Texas*, 125 S. Ct. 400, 405 (2004).

Here, the prosecutor gave the jury two reasons to believe Sims's background did not constitute legally cognizable mitigating evidence. First, according to the prosecutor, having a bad background is too common among criminal defendants to act as a mitigating factor: "If that were, therefore, a mitigating factor, then you would be emptying prisons because it would apply to vertually [sic] everybody. . . . Were it a mitigating factor that a person had a bad childhood, then you would have no death penalty statute at all." Second, in the prosecutor's view Sims's mitigating evidence was disqualified as a factor to be considered and weighed by the jury because of the absence of a connection between Sims's background and his crime: "There is no bridge that bridges this bad background to anything we have in the case before us. . . . What happened to Mr. Sims, as bad as it was, was ten years before the crimes in question. . . . What does it mean in terms of assigning a mitigating factor to it? What does it mean in terms of punishment? *It doesn't mean a thing. There is no mitigating factor there*" (emphasis added). Under the Supreme Court's Eighth Amendment jurisprudence, the prosecutor's argument was wrong on both counts.

When the Supreme Court "addressed directly the relevance standard applicable to mitigating evidence in capital cases," it "spoke in the most expansive terms." *Tennard*, 124 S. Ct. at 2570 (describing *McKoy*). Discounting an aspect of a defendant's background because he shares it in common with other defendants is the antithesis of the individualized consideration the Supreme Court has found indispensable to a capital sentencing process that comports with the Eighth Amendment. *See, e.g., Eddings*, 455 U.S. at 112. Thus, the Supreme Court has rejected the proposition that mitigating evidence can be restricted to facts about the defendant that are "uniquely severe." *Tennard*, 124 S. Ct. at 2569-70. The prosecutor's "bridge" theory is equally faulty: the requirement that mitigating evidence bear some connection to the defendant's crime is one that the Supreme Court "never countenanced and now [has] unequivocally rejected." *Smith*, 125 S. Ct. at 405 (citing *Tennard*). Thus, it is clear that the prosecutor misstated the law of mitigating evidence in both of the respects Sims alleges.

The prosecutor's misstatements of law entitle Sims to reversal of his death sentence if "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. Though "arguments of counsel generally carry less weight with a jury than do instructions from the court," the Supreme Court has acknowledged that prosecutorial misstatements of law may "have a decisive effect on the jury." *Id.* at 384. "[T]he arguments of counsel, like the instructions of the court, must be judged in the context in which they are made." *Id.* at 385.

Viewed in context, the prosecutor's statements during Sims's penalty phase more than likely misled the jury and clearly were intended by the prosecutor to persuade the jury that they could not consider Sims's dreadful childhood. The prosecutor did not merely argue (as the majority would have it) that Sims's mitigating evidence lacked persuasive power;

rather, the prosecutor repeatedly argued both implicitly and explicitly that Sims's background was not legally cognizable mitigating evidence *at all*. By hypothesizing what would happen "*[i]f, in fact, it were* a mitigating factor that a person had a bad childhood" (emphasis added), the prosecutor clearly implied that a bad childhood is, in fact, not a mitigating factor. I agree with the California Supreme Court's conclusion in Sims's direct appeal that "the prosecutor's comment that the troubled background of a defendant does not constitute a mitigating factor might have tended to suggest erroneously that the jury could not consider such evidence in mitigation." *Sims*, 853 P.2d at 1029. If anything, this is an understatement. The prosecutor was even more explicit in his assertion that the absence of a connection between Sims's background and his crime disqualified his background as mitigating evidence: "There is no bridge that bridges this bad background to anything we have in the case before us. . . . *It doesn't mean a thing. There is no mitigating factor there*" (emphasis added).[7]

The prosecutor's clear message — that Sims's background was not mitigating evidence for two reasons — was not confined to an isolated or offhand remark. On the contrary, the prosecutor made extensive use of both of his theories as to why Sims's background categorically did not qualify as mitigating evidence. Three times the prosecutor invoked the prevalence of troubled backgrounds among the criminal

---

[7]The prosecutor's closing was replete with implicit as well as explicit assertions that a connection between Sims's background and his crime was a prerequisite to the jury's consideration of that background as mitigating evidence. For example:

> So, again, we are searching for a bridge, we are searching for some kind of bridge. I suppose if the offense was against his stepfather, certainly *it would be relevant, then, wouldn't it*? No question about that.

(emphasis added). Again, by posing a hypothetical in which Sims's background "would be relevant," the prosecutor clearly implied that it was not relevant in Sims's case.

population to suggest that a bad background is not mitigating evidence. The prosecutor's invocation of the "bridge" theory was even more ubiquitous: in total, the prosecutor used the word "bridge" or some form of the word "connection" in reference to Sims's background no fewer than *seventeen* times during the penalty phase closing. Perhaps most damaging, on three occasions the prosecutor told the jury flat out that Sims's background was "not a mitigating factor," that "[t]here is no reason for mitigating factors," that "[t]here is no mitigating factor there." Although determining the effect of the prosecutor's closing on the jury is not a mere matter of counting words or phrases, in this case the numbers are a reasonable barometer of the extent to which the prosecutor's misstatements of the law were a point of emphasis with the jury.

Squarely on point is our en banc decision in *Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002) (en banc) ("*Payton I*"), *vac'd on other grounds*, 538 U.S. 975 (2003), *on remand at Payton v. Woodford*, 346 F.3d 1204 (9th Cir. 2003) (en banc) ("*Payton II*"), *rev'd sub nom. Brown v. Payton*, 125 S. Ct. 1432 (2005) ("*Payton III*").[8] In *Payton I*, we affirmed the grant of a habeas petition as to a death sentence because an ambiguous instruction (a forerunner of the factor (k) instruction given at Sims's trial), combined with prosecutorial misstatements of the law, had prevented the jury from considering mitigating evidence of the defendant's post-crime religious conversion. 299 F.3d at 820-23, 830. While Sims does not argue (as Payton did) that the factor (k) instruction itself was inherently ambiguous, "[t]he prosecutor's arguments can-

---

[8]*Payton I* granted relief under pre-AEDPA law, *see* 299 F.3d at 822, 830, and the Supreme Court summarily vacated and remanded for reconsideration of whether AEDPA applied to Payton's petition. *See* 538 U.S. 975 (citing *Woodford v. Garceau*, 538 U.S. 202 (2003)). In so doing, the Court suggested only that we had applied the wrong standard of review, not that our application of that standard was faulty. *Payton I* remains good law with respect to the determination of a claim — such as Sims's — of Eighth Amendment instructional error evaluated under pre-AEDPA standards.

not be isolated from the instruction itself or from the failure of the trial judge properly to instruct the jury or to correct the prosecutor's error." *Id.* at 823. The prosecutorial misrepresentations of law that occurred in Sims's case bear a striking resemblance to those we refused to countenance when we applied pre-AEDPA habeas standards in *Payton I.*

There as here, the prosecutor asserted several times (erroneously) that factor (k) did not permit jurors to consider in mitigation precisely the type of evidence that the defendant had offered. *Id.* at 821. There as here, the prosecutor told the jury that they had "not heard any evidence of mitigation in this trial." *Id.* If anything, the misstatements of the law in Sims's case were more injurious than those in Payton's because Sims's prosecutor offered the jury *two* erroneous legal principles as alternative bases for disregarding Sims's mitigating evidence. And there as here, the prosecutor did not merely "argue[ ] that in his view the evidence did not sufficiently mitigate [the defendant's] conduct," *Boyde*, 494 U.S. at 385 (citation and internal quotation marks omitted); rather, "the prosecutor here told the jurors that the statutory list of factors *precluded them from considering* the only mitigating evidence [the defendant] presented." *Payton I*, 299 F.3d at 825 (emphasis altered).[9] The majority's contrary conclusion is belied by the record of what Sims's prosecutor actually said, which can be summed up in six of his own words: "[t]here is no mitigating factor there."

In sum, the prosecutor misstated the law repeatedly and extensively. His erroneous "bridge" theory was a particular point of emphasis. The prosecutor's conclusion that "[t]here is no mitigating factor there," which he reiterated to the jury

---

[9]I note that Sims's family witnesses also testified to Sims's generosity and that his children worshiped him and urged that his life was worth saving; however, this testimony was brief and limited. Aside from these few remarks, Sims's case in mitigation consisted entirely of the compelling evidence of his traumatic childhood.

on several occasions, explicitly instructed the jury to disregard — not just to devalue — the mitigating evidence that Sims offered. The trial court failed to give any sort of curative instruction directed at the prosecutor's misstatements of the law; what instructions the court did give were entirely inadequate. Coupled with the court's refusal to correct the prosecutor when there was objection, this left the jury with the uncorrected and inaccurate impression that Sims's background did not qualify as mitigating evidence, because he had not established a "bridge" between his background and his crime, and because a troubled background is too common among criminals to count as a mitigating factor. Consequently, there is at least "a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380.

## IV. Injurious Effect of the Prosecutor's Misstatements

I circle back to the issue with which I began: whether the error meets the *Brecht* standard for harmfulness. The Supreme Court has explained that the *Boyde* test "is not a substitute for the *Brecht* harmless-error test. The *Boyde* analysis does not inquire into the actual effect of the error on the jury's verdict; it merely asks whether constitutional error has occurred." *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998) (per curiam).

Here, there is at least "grave doubt" as to whether the constitutional error wrought by the prosecutor's repeated mischaracterizations of the law of mitigation had a "substantial and injurious effect or influence" on the verdict. *O'Neal*, 513 U.S. at 436 (internal quotation marks omitted). The crime was unquestionably brutal. The evidence against Sims was strong. Several aggravating factors were present, including Sims's commission of two other murders, and the horrific circumstances of this one. The callous nature of Sims's conduct and his leading role in the murder also weigh against him.

But Sims's childhood abuse was quite shocking as well, as even the prosecutor admitted. The prolonged and continuous physical, emotional, and sexual abuse he endured at the hands of his stepfather may well have been sufficient to generate enough sympathy to move a jury to spare Sims's life — had the jury understood that it was its duty to consider it. Instead, there is at least a "reasonable likelihood that," as a result of the prosecutor's repeated distortions of the law as to the role of mitigating evidence, "the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. Because Sims's troubled background was central to his mitigation defense, the prosecutor's insistent assertion that the jury could not consider Sims's background "left the jury bereft of any countervailing evidence to weigh against the prosecution's evidence of aggravating circumstances." *Payton I*, 299 F.3d at 829. It is difficult to imagine that the jury's calculus would not have changed significantly had the powerful evidence of Sims's background been brought to bear.

The defendant "for whom life or death hangs in the balance deserves the benefit of the doubt." *Mayfield v. Woodford*, 270 F.3d 915, 933 (9th Cir. 2001) (en banc) (Gould, J., concurring) (internal punctuation omitted). In Sims's case, ultimately "[w]e cannot know whether the jury would have returned a verdict of life or of death had it been properly instructed." *Payton I*, 299 F.3d at 829. Given "grave doubt" as to the harmlessness of the error, reversal is the prescribed course. *O'Neal*, 513 U.S. at 436. I would hold that the prosecution's misstatements of the law of mitigating evidence violated the Eighth Amendment and that Sims is entitled to relief from his death sentence.

## V.   Cumulative Error

"Even if no single error were sufficiently prejudicial, where there are several substantial errors, their cumulative effect may nevertheless be so prejudicial as to require reversal."

*Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003) (citations, internal quotation marks, and source's brackets omitted). Even were the *Miranda* and Eighth Amendment violations insufficient on their own to warrant habeas relief from the penalty-phase verdict, the combined effect of these errors certainly prejudiced Sims and warrants setting aside the death sentence.

In this case, the *Miranda* and Eighth Amendment violations present a particularly compelling claim of cumulative error, because the combined effect of these errors was more powerful than that of the errors taken individually. The prosecutor's emphasis on Sims's statements "I had to kill that boy" and "I knew I was doing it, but I shouldn't [have] done it," and the prosecutor's repeated insistence to the jury that Sims's background was not mitigating evidence, comprised two of the major themes of the prosecutor's penalty-phase closing argument. *Cf. Alcala*, 334 F.3d at 893 (finding cumulative error in part because "the cumulative impact of the errors goes to the heart of the prosecution's theory of the case"). As I have noted, the prosecutor's closing argument emphasized both Sims's lack of remorse (as demonstrated in the December 25 and 26 conversations with Officer Perkins) and Sims's supposed failure to present mitigating evidence. Additionally, the tape of Sims's December 26 statements — which included the admission "I knew I was doing it, but I shouldn't [have] done it" — was replayed for the jury during the prosecution's penalty phase case.

Just as significant as the extent of the constitutionally impermissible comments was their force. The prosecutor's reiteration of the statements "I had to kill that boy" and "I knew I was doing it, but I shouldn't [have] done it" — both obtained in violation of *Miranda* — focused the jury's attention on what was probably the most powerful evidence of Sims's guilt. They completely foreclosed any attempt to argue lingering doubt as to intent. They formed the backbone of the prosecutor's argument that Sims's lacked remorse. Equally

damaging, the prosecutor's misrepresentations of the law of mitigation invited the jury to disregard evidence of Sims's awful childhood, which was substantially the only evidence Sims offered in mitigation.

These errors — if not separately, then certainly together — undermined the fairness of the process by which Mitchell Sims was sentenced to death: in one morning, in one concentrated pitch to the jury just hours before they retired to deliberate, the prosecutor stressed powerful but constitutionally inadmissible evidence in support of death and improperly undercut practically all of Mitchell Sims's evidence in favor of life. As a result of these errors, the jurors quite likely commenced their deliberations with the wrong mind-set.

"The collective presence of these errors is devastating to one's confidence in the reliability of this verdict[.]" *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002). Faced with two substantial penalty-phase errors and their correspondingly serious effects on the evidence Mitchell Sims's jury considered in imposing its sentence of death, we should follow the Supreme Court's example and refuse to "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Penry*, 492 U.S. at 328 (citations and internal quotation marks omitted).

I respectfully dissent from the majority's decision to uphold Sims's death sentence.